LARRY N. PHILLIPS *et al.*, Plaintiffs-Appellants, v. SHELBY BRITTON *et al.*, Defendants-Appellees.

Fifth District   No. 5—86—0275

Opinion filed November 9, 1987.

Stephen C. Buser, of Lopinot, Frierdich, Buser & Morris, of Columbia, for appellants.

Jerry Doyle Miller, of Bowen & Miller, of Olney, for appellees Shelby Britton and Sylvia Britton.

No brief filed for appellee Ingraham State Bank.

JUSTICE HARRISON delivered the opinion of the court:

Plaintiffs, Larry and Carol Phillips, filed a complaint in the circuit court of Clay County after defendants Shelby and Sylvia Britton allegedly failed and refused to complete the purchase of certain real property. The Phillipses' complaint was in four counts. Counts I through III were directed against the Brittons. Count I sought dam-

ages based on breach of an oral contract, count II prayed for specific performance of that contract, while count III requested damages under the theory of promissory estoppel. Count IV, directed against defendant Ingraham State Bank, asked simply that the bank be required to act as escrow agent for the land in issue if the relief requested in counts I, II or III were granted.

The Brittons denied the allegations in the complaint and raised as an affirmative defense the Statute of Frauds (Ill. Rev. Stat. 1985, ch. 59, par. 2). They also filed a counterclaim alleging that the Phillipses had breached certain oral agreements relating to the Phillipses' right to reside on and to farm a parcel of the land involved in this dispute. The counterclaim requested that the Phillipses be ordered to vacate the premises and, following an accounting, to pay the Brittons a sum equal in value to one-third of the crops harvested from the land.

Following a bench trial, the circuit court entered judgment against the Phillipses on all four counts of their complaint. At the same time, it found moot the Brittons' request that the Phillipses be ordered to vacate the premises, but ordered the Phillipses to render an accounting to the Brittons regarding the crops harvested by them from the land in 1981 and to then pay the Brittons "the amount due as their net 1/3 landlord's share as customarily determined in Clay County cropshare leases of farm land." On the Brittons' timely post-trial motion, this judgment was subsequently modified with respect to the finding of mootness, and the Phillipses were ordered to vacate the premises.

The Phillipses now appeal, contending that the circuit court's judgment against them on their complaint and in favor of the Brittons on the counterclaim is contrary to the manifest weight of the evidence. The Phillipses further assert that the court committed reversible error in its rulings on the admissibility of certain evidence. For the reasons which follow, we affirm.

The record before us shows that in 1977 the Phillipses purchased a 25-acre tract of land in Clay County from Talmage Wood for $10,500 under a contract for deed. A $2,000 down payment was made on this transaction. The following year, the Phillipses purchased another tract of land in Clay County from Mr. Wood, this one measuring 80 acres. The 80-acre tract was also acquired under a contract for deed. It carried a purchase price of $88,000, on which the Phillipses made a down payment of $10,000. The money for this down payment was obtained by the Phillipses through a loan from the Ingraham State Bank.

The Phillipses subsequently obtained a second loan from the bank

in the amount of $13,000. Most of the proceeds of that loan were used by the Phillipses to repay the initial loan. The balance went to pay off the remaining amount then owed by the Phillipses to Mr. Wood on the purchase price of the 25-acre tract and to help repay miscellaneous debts they owed to others. The loan was secured by a $13,000 mortgage on the 25-acre tract.

In the period which followed, the Phillipses were able to reduce the balance due on the $13,000 mortgage to approximately $8,500 plus interest, but they made only one payment of $9,750 in principal and interest to Mr. Wood under the contract for deed covering the 80-acre tract, leaving a balance due on that obligation of $68,250. At the same time, they took out more than $12,000 in loans from the FHA secured by a chattel mortgage on their crops and machines, as well as a series of additional loans from the Ingraham State Bank. Testimony at trial established that by the end of June 1981, the Phillipses owed the bank some $111,000.

The Phillipses soon found that they were unable to meet the various debt obligations they had incurred. Larry Phillips thereupon began to search for additional financing. After contacting several lending institutions, he broached the subject with Shelby Britton, for whom he was then working. Phillips testified that he and Mr. Britton ultimately agreed that the Phillipses would sell both the 80-acre and the 25-acre tracts to the Brittons for $100,000 if the Brittons would also assume the contract for deed on the 80 acres. According to Phillips, the agreement further required that he and his wife pay off the balance of the mortgage on the 25-acre tract, which they planned to do using the proceeds of the $100,000 payment, so that the tract could be conveyed to the Brittons with a clear title. Phillips noted that Mr. Britton had asked if he would consider accepting an interest in an oil lease instead of cash, but claims that he rejected this proposal.

The Phillipses resided in a house on the 80-acre tract, and they understood that they would be permitted by the Brittons to remain there after the sale so long as they continued to pay the insurance and taxes. Mrs. Britton initially testified that she shared this understanding, but later modified her testimony to corroborate that of her husband, who stated that the agreement was to allow the Phillipses to remain in the house only so long as they also met the additional condition that Larry Phillips continue to work for Mr. Britton.

The Brittons differed from the Phillipses in their understanding of the terms of the land sale itself. The Brittons were admittedly interested in buying both the 80-acre and the 25-acre tracts, but testified

that they viewed these as independent transactions. According to the Brittons, the Phillipses were to transfer the 80-acre tract to them, in exchange for which the Brittons would assume liability for and pay off outstanding arrearages on the contract for deed with Mr. Wood. No additional monetary compensation was to be paid to the Phillipses, although, as noted, the Phillipses were to be permitted to continue to reside on the land under certain conditions. With respect to the 25-acre tract, the Brittons understood the agreement to be that if the Phillipses could deliver clear title, the Brittons would assign to them a one-quarter interest in an oil and gas lease as payment. Mr. Britton related that Larry Phillips had told him he proposed to pay off the encumbrances on that tract by selling his farm machinery.

Robin Todd, an attorney from Louisville, Illinois, represented both the Phillipses and the Brittons with respect to the sale of the land. Larry Phillips testified that he went with the Brittons to Todd's office on June 22, 1981, to discuss the transaction. Phillips claims that he told Todd of the existing debt against the 25-acre tract and explained that he needed the $100,000 in cash in order to pay off that debt and give clear title to the property. In Phillips' words,

> "My understanding Robin [Todd] was to get all the paper work done to the effect when we went to Ingraham for the closing whatever, that it would be [Shelby Britton] would give me the $100,000 for the 105 acres and Shelby would assume the contract [for deed on the 80 acres] and I was to pay the mortgage on the twenty-five acres and give me a free and clear title to the twenty-five acres."

Phillips testified that he did not recall any discussion at that meeting regarding assignment of an oil and gas lease.

Todd, who was himself called as a witness, remembers the meeting differently. Todd denied that there was any discussion at all regarding conveyance by the Phillipses of the 25-acre tract or that there was a discussion about payment by the Brittons to the Phillipses of $100,000.

Closing on the sale was held the following afternoon at the Ingraham State Bank. Present were the Phillipses, the Brittons, Talmage Wood, Wood's attorney, Todd, and Gayle Bryan, cashier of the bank. Larry Phillips and his wife observed that Todd had prepared only the assignment by which the Phillipses were to convey the 80-acre tract to the Brittons. There were no additional documents regarding the 25-acre tract or payment of the $100,000. Larry Phillips testified that Todd told him he had not had time to complete the additional paper work and that it would be taken care of in a few days. His wife like-

wise reported that Todd advised them not to worry and that he would take care of the matter. She further testified that Shelby Britton said that the Phillipses would receive the $100,000 in a few days.

Although Sylvia Britton recalled talking about closing on both the 80-acre and the 25-acre tracts during the meeting at Todd's office the previous day, she testified that the Phillipses never said that sale of the 80-acre tract was contingent on sale of the 25-acre tract. She stated that the Phillipses never mentioned the $100,000 at the closing, nor did the bank ask about it. She and her husband both testified that Todd advised them not to execute an assignment of the oil and gas lease in favor of the Phillipses because the Phillipses could not give clear title to the 25-acre tract. Both denied having promised to pay the Brittons $100,000.

Despite the absence of any documentation confirming the Brittons' alleged agreement to pay $100,000 or setting forth the terms by which the 25-acre tract was to be conveyed, the Phillipses nevertheless executed the assignment to the Brittons of the contract for deed on the 80-acre tract. That assignment, which was also signed by the Brittons, required the Brittons to assume payments under the contract and to pay off the outstanding arrearages then due, but imposed no further obligations on the Brittons with respect to the Phillipses. Todd testified that the Phillipses expressed no objection to executing the assignment. He denied that the Phillipses asked about additional paper work or the payment of the $100,000. He said that he had advised Mr. Britton that the 25-acre tract was subject to a mortgage and that Britton would not take the property so encumbered. Todd's understanding was that the Phillipses were simply going to turn the 80-acre tract over to the Brittons without payment of additional compensation.

Jerry Stanley, president of the Ingraham State Bank, testified that before the closing he had discussions with the Phillipses regarding sale of both the 80-acre and the 25-acre tracts. Prior to closing, the bank's information about the terms of the sale came solely from Larry Phillips. Based on that information, the bank believed that the Phillipses would receive $100,000 as part of the sale of both tracts, and it prepared a release of its mortgage on the 25-acre tract in anticipation that the mortgage would be paid off out of this $100,000. Gayle Bryan, the bank's representative at the closing and the person who actually prepared the release, stated, however, that he could not recall what became of the release. He further testified that the $100,000 was not exchanged, that no inquiry was made by the Phillipses or anyone else regarding the $100,000 and that neither of the

Phillipses voiced objection to execution of the assignment transferring the 80-acre tract to the Brittons.

Upon closing, the Brittons paid Talmage Wood some $20,000 to eliminate the accumulated arrearages on the contract for the 80-acre tract, and from that time forward they apparently made the required payments in a timely fashion. The Brittons permitted the Phillipses to continue to reside on the property as agreed. They also allowed the Phillipses to farm the land using their equipment during 1981. Shelby Britton testified that, in exchange, the Brittons were to receive one-third of the crops harvested. This share was never paid. In 1982, Larry Phillips left Shelby Brittons' employ.

On July 14, 1981, the president of the Ingraham State Bank telephoned Todd regarding the status of the transaction. He testified that Todd confirmed that the Phillipses were to receive payment of $100,000 which was to be used to pay off the debt on the 25-acre tract so that the Phillipses could convey title to that tract to the Brittons.

Another witness, Victor Katt, stated that in 1981 he negotiated with Shelby Britton to acquire an interest in an oil and gas lease owned by Britton. According to Katt, Britton advised him that he had just bought a farm above Clay City (where the property at issue here was located) and needed $100,000. Katt understood this to be the reason Britton was interested in making the sale. Katt admitted, however, that Britton did not specifically identify the farm to which he was referring, and the evidence showed that Britton had purchased additional farmland in the same area that year. Moreover, while Katt paid Britton $105,200 for the purchase of the interest in the oil and gas lease, the Brittons claimed that this money was not to pay the Phillipses, but to cover costs incurred in connection with an oil drilling project related to the lease.

During the summer of 1981, Larry Phillips was summoned to appear in small claims court in Clay County to answer a complaint against him for nonpayment of a $2,000 diesel fuel bill. Phillips contacted Robin Todd for assistance. On August 19, the court date, Todd met Phillips in the courthouse lobby. Todd discussed the matter with the plaintiff's attorney, Fred McCollum. According to Phillips,

> "Robin Todd indicated to Fred McCollum that I would be receiving money from Mr. Britton within a few weeks and that I was to write a check out to the [plaintiff] in the amount due in small claims, plus court costs. And I wrote it out. And we didn't date it."

Phillips explained that the check was not dated "because Robin Todd

was to call Fred McCollum when I got my money from Mr. Britton, the $100,000 from Mr. Britton, and Robin was to call Fred and Fred was to take the check and send it through."

Todd testified that the president of the bank, Mr. Stanley, contacted him on numerous occasions following the closing to "inquire whether the paper work was ready to close out the twenty-five acre transaction." According to Todd, he advised Stanley that he had yet to hear from the Brittons and the Phillipses as to what was to be done. Todd further testified that Larry Phillips telephoned him regularly about the same thing. Todd contends that he told Phillips that he did not know what was to be done about the 25 acres because he had not been told by either the Phillipses or the Brittons what to do. He said that he advised Phillips and Mr. Britton to come in and give him instructions but that this never occurred.

Phillips testified that the last time he talked to Todd,

> "[Todd] told me he couldn't help me, if Shelby and I got into a lawsuit he couldn't help either one of us and I didn't have grounds to fight him or Shelby either one. And besides I couldn't afford to fight either one in court."

Phillips testified that he did not contact Todd again. Todd denied having made any such statements to Phillips and indicated that he ceased hearing from Phillips sometime prior to Phillips' having secured representation from a law firm in Robinson, Illinois. On October 7, 1982, the Phillipses commenced this litigation.

■ Count I of the Phillipses' complaint sought damages from the Brittons based on the Brittons' alleged breach of the parties' oral agreement regarding sale of the 80-acre and 25-acre tracts. Generally, an oral contract to transfer real estate is unenforceable under the Statute of Frauds (Ill. Rev. Stat. 1985, ch. 59, par. 2). (*Alguire v. Walker* (1987), 154 Ill. App. 3d 438, 442, 506 N.E.2d 1334, 1338.) There is no dispute that the Brittons have properly raised that defense here. The Phillipses nevertheless suggest that their claim for damages is viable by virtue of the doctrine of part performance. We disagree.

■ ■ The courts of this State have long recognized that sufficient part performance of an oral contract to convey land may remove the transaction from operation of the Statute of Frauds. (See, *e.g.*, *Brunette v. Vulcan Materials Co.* (1970), 119 Ill. App. 2d 390, 397, 256 N.E.2d 44, 47; *Anastaplo v. Radford* (1958), 14 Ill. 2d 526, 537-38, 153 N.E.2d 37; *Flannery v. Woolverton* (1928), 329 Ill. 424, 431, 160 N.E. 762.) Part performance is, however, an equitable doctrine. (329 Ill. at 431.) It developed and has been applied in those cases

where a party is seeking the equitable remedy of specific enforcement. We do not believe that it may be invoked to sustain an ordinary action at law for damages for breach of contract. *Gibbons v. Stillwell* (1986), 149 Ill. App. 3d 411, 416-17, 500 N.E.2d 965, 969; see Restatement (Second) of Contracts §129, comment *c* (1981).

Specific enforcement was requested by the Phillipses under count II of their complaint. Even with respect to this claim, however, the Phillipses cannot prevail. The standards governing specific performance of an oral contract to convey land were set forth by this court in *Blaise v. Stein* (1979), 75 Ill. App. 3d 793, 796, 394 N.E.2d 836, 837, where we held:

> "Specific performance is not a matter of right; it is a remedy resting in the sound discretion of the court. [Citations.] Before a court may exercise that discretion in favor of granting the remedy in the case of an oral contract which would normally be unenforceable under the Statute of Frauds, the court must find that the terms of the contract are clear, definite, and unequivocal [citations], that the contract has been at least partially performed by the party seeking the remedy [citations], and that the acts allegedly done in performance are positively attributable exclusively to the contract [citations]. These elements must be proved by clear, cogent and convincing evidence leaving no reasonable doubt in the mind of the court. [Citation.]"

The existence and terms of an oral contract to convey land may be proved by circumstances, acts of the parties, and their declarations not made in the presence of each other. (*Hickey v. Hickey* (1940), 374 Ill. 614, 622, 30 N.E.2d 423.) However, as we suggested in *Blaise*, it is not enough to show that some kind of contract existed between the parties; it must appear that the contract was certain in all its terms. *Pesovic v. Pesovic* (1973), 10 Ill. App. 3d 708, 711, 295 N.E.2d 261, 264.

In this case we cannot say that the Phillipses have proved by a preponderance of the evidence, much less by clear, cogent and convincing evidence, that the terms of their alleged oral contract with the Brittons were clear, definite and unequivocal. Indeed, as our summary of the record has shown, there were material conflicts as to virtually all aspects of the transaction. The Phillipses contended that there was a single agreement covering both the 80-acre and the 25-acre tracts. The Brittons claimed that these tracts were governed by two separate and independent agreements. According to the Phillipses, the Brittons agreed to pay the Phillipses $100,000 for all 105 acres and assume the obligations to Mr. Wood imposed under the con-

tract for deed on the 80-acre tract. In exchange, the Phillipses would assign that contract to the Brittons, use the proceeds of the $100,000 payment to pay off the mortgage on the 25-acre tract and convey that tract to the Brittons with a clear title. The Brittons, by contrast, asserted that assignment to them of the Phillipses' contract with Wood on the 80-acre tract obligated them only to assume the accumulated arrearages and future payments due thereunder. They testified that they further agreed to assign a one-quarter interest in an oil and gas lease to the Phillipses for the 25-acre tract, but only if the Phillipses could convey an unencumbered title to it. They flatly denied ever offering to pay the Phillipses $100,000.

The Phillipses argue that their version of the agreement is corroborated by the testimony of independent witnesses and by various facts and circumstances surrounding the transaction. They point out Victor Katt's testimony that Shelby Britton had told him during the course of negotiations for sale of an interest in an oil and gas lease that he had just bought a farm and needed $100,000. They further point out that Katt ultimately paid the Brittons over $105,000. As we have noted, however, the farm mentioned in Katt's discussion with Britton was not specifically identified, and Britton testified that he had purchased other farmland in the area in 1981, the same year the transaction at issue in this case took place. Britton claims that it was this other land to which he was referring, and the Brittons indicated that the money received from Katt was not to be used by them to pay the Phillipses, but to meet the expenses of an oil drilling project related to the interest in the oil and gas lease purchased by Katt. Moreover, the record indicates that the Brittons already had in excess of $200,000 on hand at the time. If they were going to pay the Phillipses $100,000, they did not need to sell an interest in an oil and gas lease to do it.

The Phillipses claim that Shelby Britton actually admitted at trial that he had told Mr. Phillips that he would pay the Phillipses $100,000 after he sold an interest in an oil and gas lease, but on review of the full context in which this statement was made, we are left with considerable doubt as to whether this is really what Britton meant to say. In any case, his other testimony unequivocally and consistently denies any promise to make such a payment.

The Phillipses note that they made no further efforts to obtain financial assistance from other lending institutions after they made their agreement with the Brittons, but this does not necessarily indicate that the Brittons were supposed to do anything other than take over the contract for deed on the 80 acres, which is what they did.

The contract on the 80-acre tract was, after all, the source of the Phillipses' immediate problem. There is no evidence that imminent foreclosure was threatened on the 25-acre tract. By contrast, the Phillipses faced a default on the 80-acre tract which could have resulted in their being put out of their home. When the Brittons stepped in, however, default was averted and the Phillipses were allowed to remain on the premises. Contrary to the Phillipses' assertion, we do not believe it irrational to think the Phillipses would not have agreed to such an arrangement absent payment of further compensation.

The Phillipses adduced evidence showing that they entered into a contract in 1982 for the purchase of a mobile home costing $42,000, and they argue that they would not have assumed such an obligation unless they had been assured that the Brittons were going to pay them the $100,000. According to the Brittons' version of the facts, however, the Phillipses were to be allowed to remain on the 80-acre tract only so long as Larry Phillips continued to work for Mr. Britton, and the evidence showed that Phillips left Britton's employ in 1982. The Phillipses were thus in need of somewhere else to live. The trial court could certainly have concluded that this (as opposed to an assurance of a $100,000 payment) was the basis for the purchase.

The Phillipses cite three further "facts and circumstances" which they say evince the existence of an agreement by the Brittons to pay the $100,000. These are: (1) the testimony of the president of Ingraham State Bank regarding his telephone conversation on July 14, 1981, with Robin Todd which indicated that Todd had advised him that a $100,000 payment to the Phillipses would be forthcoming from the Brittons; (2) Todd's advice to Larry Phillips in August of 1981 at the Clay County courthouse in regard to the small claims action to the effect that Phillips should tender an undated check to his creditor's attorney which could be used to pay the claim when the Brittons paid Phillips the $100,000; and (3) Larry Phillips' repeated calls to Todd to find out when the $100,000 would be paid.

We note, however, that there was other evidence showing that Todd himself consistently denied knowing of the $100,000 payment and that he told Larry Phillips and the bank president when they called after the closing that he was still awaiting instructions as to what to do about the 25-acre tract. With respect to the small claims action, the Phillipses did not question Todd at trial about the undated check, nor did they call as a witness the attorney for the creditor involved in that dispute. Moreover, the Phillipses' claim conflicts with the evidence which showed that the bank's representative at the closing did not inquire about the $100,000 and is inconsistent with the

testimony of Todd, the bank's representative, and the Brittons, who all indicated that no such inquiry was made even by the Phillipses themselves.

■ Viewing the record as a whole, we believe that resolution of this case ultimately turns, in large measure, simply on which witnesses are to be believed. The credibility of the witnesses, however, was a matter for the trial court to assess. The testimony adduced by and on behalf of the Brittons here could have left the trial court with substantial uncertainty as to the actual terms of the parties' agreement. Accordingly, we cannot say that specific performance was improperly denied.

We turn then to the Phillipses' claim for promissory estoppel. As we have recently held,

> "[p]romissory estoppel is an equitable device invoked to prevent a person from being injured by a change in position made in reasonable reliance on another's conduct. [Citation.] It is a doctrine under which a plaintiff may recover without the presence of a contract, and the courts have permitted suit on this theory in the absence of a contract. [Citation.] To recover under this doctrine, the following elements must be met: (1) a promise, (2) which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee, (3) which induces such action or forbearance, and (4) which must be enforced in order to avoid injustice. [Citation.] Whether or not these factors are all present is a question of fact to be determined by the trial court, and a court of review will not reverse the trial court's decision unless it is against the manifest weight of the evidence. [Citation.]" *Lawrence v. Board of Education of School District 189* (1987), 152 Ill. App. 3d 187, 201, 503 N.E.2d 1201, 1210.

■■ ■ The law in Illinois is unsettled as to whether an action based on promissory estoppel can prevail where, as here, the action would otherwise fall within the Statute of Frauds. (See *Goldstick v. ICM Realty* (7th Cir. 1986), 788 F.2d 456, 465-66.) We need not undertake any further discussion of this point, however, for regardless of the applicability of the Statute of Frauds, the Phillipses' promissory estoppel claim was properly rejected. Where recovery is sought under the theory of promissory estoppel, the promise which the plaintiffs are required to prove must be unambiguous. (*Swansea Concrete Products, Inc. v. Distler* (1984), 126 Ill. App. 3d 927, 933, 467 N.E.2d 388, 392.) The promise which the Phillipses contend to have made in this case, however, is the same as the agreement underlying their claim

for breach of contract, and the evidence adduced by them with respect to each is identical. Just as we believe that the trial court could have found that the terms of the agreement were not clear, definite and unequivocal, we therefore likewise believe that it could have determined that the promise was not unambiguous.

The Phillipses next attack the circuit court's judgment in favor of the Brittons and against them on the counterclaim. While they do not deny that they were properly ordered to vacate the 80-acre tract, they argue that there was no evidence to support an award to the Brittons of a sum equal to one-third of the value of the crops harvested by the Phillipses on the Brittons' land using the Brittons' farm equipment during 1981. This is simply not so. Mr. Britton clearly testified that he had such an agreement with the Phillipses. The agreement was apparently made in addition to the arrangement under which the Phillipses were permitted to reside on the premises, and its existence was never denied by the Phillipses.

The Phillipses further assert that the Brittons adduced insufficient evidence as to their damages. This claim is meritless. There is no dispute that the Brittons did not receive their one-third share under the agreement. The value of the one-third share was certainly an appropriate measure of their damages, and the trial court ordered an accounting to determine that value.

■ The Phillipses next contend that the trial court committed reversible error when it excluded from evidence a letter dated August 26, 1982, to the Brittons from Todd. The salient portion of that letter, which the Phillipses characterize as addressing "the heart of the entire case," pertains to the terms of the parties' oral agreement and the assignment of the 80-acre tract. Of particular significance, according to the Phillipses, is Todd's statement in the letter that "[w]hile it is true this is not in writing, it would seem unlikely that this property would be transferred to you at cost only."

The letter was not admitted because the trial court viewed it as constituting nothing more than an offer of compromise or settlement. The Phillipses dispute this characterization, but whether or not the trial court's analysis was correct is entirely academic. As a general rule, error in the exclusion or admission of evidence is harmless and does not require reversal if there has been no prejudice or if the evidence has not materially affected the outcome of the trial. (*Ford v. City of Chicago* (1985), 132 Ill. App. 3d 408, 414, 476 N.E.2d 1232, 1237-38.) The effects which the letter may have had on the Phillipses' case here are doubtful. While the letter suggests that an oral agreement or promise may have existed involving more than the assign-

ment of the 80-acre tract, other evidence did as well, and the letter does not make the agreement more definite or the promise less ambiguous. In any case, while the letter itself was refused, the central passage quoted above was read into the record by Mr. Britton during his examination. Under these circumstances we fail to see how the Phillipses suffered any prejudice.

The Phillipses also claim that the trial court committed reversible error when it prevented the Phillipses' attorney from asking the Brittons about the terms of the transaction involving the 80-acre tract as part of the Phillipses' case in chief. The record discloses, however, that testimony regarding the terms of the agreement was presented by the Brittons during their case, that the Phillipses' attorney had every opportunity to cross-examine the Brittons regarding the transaction, and that the Phillipses' attorney did in fact cross-examine Mr. Britton about it. Again, we see no prejudice.

■■ Finally, the Phillipses attack the trial court's decision to allow into evidence various documents which purported to show expenditures made by the Brittons in completing the oil drilling project related to the oil and gas lease they sold to Victor Katt. The Phillipses objected to these documents on grounds of relevancy and lack of foundation, but the merits of these objections need not be reached, for it is axiomatic that where, as here, a case is tried by the court without a jury, error in admitting improper evidence is not grounds for reversal as long as there is sufficient competent evidence fairly tending to support the judgment. (*Owen v. Pret' A Porter Boutique, Inc.* (1973), 15 Ill. App. 3d 438, 443, 302 N.E.2d 672, 676.) As our previous discussion has suggested, we believe that there would have been sufficient competent evidence to support the trial court's judgment in this case, even if the disputed documents had been excluded.

For the foregoing reasons, the judgment of the circuit court of Clay County is affirmed.

Affirmed.

WELCH and LEWIS, JJ., concur.