**Ilan GEVA, Plaintiff–Appellant,**

v.

**LEO BURNETT COMPANY, INCORPORATED, Defendant–Appellee.**

**No. 90–1418.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 9, 1990.

Decided May 10, 1991.

Rehearing and Rehearing En Banc Denied May 31, 1991.

John M. Bowlus, Joyce & Kubasiak, Chicago, Ill., for plaintiff-appellant.

Gerald D. Skoning, Laura R. Garger, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for defendant-appellee.

Before BAUER, Chief Judge, and CUDAHY and EASTERBROOK, Circuit Judges.

CUDAHY, Circuit Judge.

Leo Burnett Company needed a creative designer to fill a position in one of its specialized advertising groups. In November 1987, it found Ilan Geva, an Israeli citizen working in the United States as a nonresident alien. Geva moved to Chicago from Los Angeles in April 1988 to begin work for Leo Burnett. When the company terminated him abruptly the following August, Geva brought this suit for damages. The district court granted Leo Burnett's motion for summary judgment, and we affirm.

## I.

Our standard of review in cases decided on summary judgment is *de novo*, and we resolve any reasonably disputed factual questions in favor of the non-moving party. *Becker v. Tenenbaum–Hill Assoc., Inc.*, 914 F.2d 107, 110 (7th Cir.1990). Ilan Geva was living in Los Angeles and working at the local office of Ogilvy & Mather when Leo Burnett contacted him in the fall of 1987. The Chicago advertising firm was searching for someone to serve as senior art director for its Direct Response Group. Leo Burnett twice flew Geva to Chicago to discuss the position, describing Geva's compensation and scope of duties during those talks but never mentioning a specific duration of employment.

Once convinced that Geva was right for the job, Leo Burnett still had to worry about its prospective employee's immigration status. When contacted by Leo Burnett, Geva possessed an L visa for intracompany transfers, having worked for Ogilvy & Mather in South Africa before transferring to its Los Angeles office.[1] He had

---

1. Immigration and Nationality Act section 101(a)(15)(L) classifies as a nonimmigrant:

an alien who, immediately preceding the time of his application for admission into the Unit-

applied for permanent resident status, but had not yet received his green card. Leo Burnett engaged a Chicago law firm to assist Geva in changing his immigration status. Because an L visa would not allow Geva to work for Leo Burnett, he decided after consultation to drop his application for permanent resident status and to seek instead an H–1 nonimmigrant visa.[2] On February 22, 1988, in assisting in Geva's H–1 visa application, Leo Burnett submitted a petition to the Immigration and Naturalization Service (INS) describing both Geva's qualifications and the firm's exceptional needs. The petition summarized the terms of Geva's employment, including not only his salary and benefits but the duration of his employment—anticipated to be three years. In preparing this petition, Leo Burnett's lawyers contacted Geva for certain background information, but the plaintiff did not learn of the report's content, including its assessment of duration, until his H–1 visa was granted in late March.

Geva received a formal offer of employment from Leo Burnett after acquiring his new nonimmigrant visa. He reported for work on April 14, 1988. As was the custom at Leo Burnett, Geva was handed a number of forms to sign on his first day, one of which included the following waiver:

> PLEASE READ AND SIGN.... I agree to conform to the rules and regulations of Leo Burnett Company, Inc., and my employment and compensation can be terminated, with or without cause, and with or without notice, at any time, at the option of either the Company or myself. I understand that no Leo Burnett Company employee has authority to enter or offer an agreement for employment for any specified period of time or to make any agreement contrary to this policy.

Geva signed this waiver. On the same day, he inquired whether Leo Burnett would provide his employment terms in writing, but the request was denied. Along with the assorted forms, Geva received the company's employee handbook. Geva worked for Leo Burnett for approximately four months before he was terminated.

Invoking diversity jurisdiction, the plaintiff filed this suit in federal court for the wages he lost over three years as a result of his alleged wrongful termination. He argued two distinct theories of liability. First, Geva asserted that, in terminating him prior to three years employment, Leo Burnett violated the party's employment agreement. Second, he claimed that the employee handbook guaranteed him rights that were ignored in his termination.

## II.

In Illinois, workers without an enforceable contract that either states a duration for employment or permits termination of employment by an employer only under specified circumstances are considered employees at will. *Mann v. Ben Tire Distribs., Ltd.,* 89 Ill.App.3d 695, 697, 44 Ill. Dec. 869, 870, 411 N.E.2d 1235, 1236 (1980). Geva has not argued, either below or on appeal, that he possessed a written agreement for three years of employment with Leo Burnett. Though he asked to have his

---

ed States, has been employed continuously for one year by a firm or corporation ... and who seeks to enter the United States temporarily in order to continue to render his services to the same employer ... in a capacity that is managerial, executive or involves specialized knowledge....

8 U.S.C. § 1101(a)(15)(L) (1988). The Immigration Act of 1990, Pub.L. No. 101–649, § 206(c), 104 Stat. 4978, 5023, prospectively amended this section to allow an applicant admission if she worked for the employer within three years prior to her application.

**2.** Upon leaving Ogilvy & Mather, Geva would no longer have the status of an L nonimmigrant.

Changing his visa status was therefore prerequisite to accepting a position with Leo Burnett. Section 101(a)(15)(H)(i) of the Immigration and Nationality Act, on which H–1 visas are based, classifies as a nonimmigrant:

> an alien having a residence in a foreign country which he has no intention of abandoning (i) who is of distinguished merit and ability and who is coming temporarily to the United States to perform services of an exceptional nature requiring such merit and ability....

8 U.S.C. § 1101(a)(15)(H)(i) (1988). This provision has been amended more than once since 1988, most recently by the Immigration Act of 1990, *supra* note 1, § 205(c), 104 Stat. at 5020.

terms of employment set out in writing, the company refused and he began work nonetheless. When Geva pressed his claim to a three-year period of employment in the district court, Leo Burnett defended on the basis of the statute of frauds, which requires a written contract for any agreement that cannot be performed within a year. Ill.Rev.Stat. ch. 59, ¶ 1 (1989). To this defense Geva responds that, in quitting his job and moving to Chicago from Los Angeles, he detrimentally relied on the promise of three years' employment. Due to this reliance, Geva asserts that Leo Burnett should be estopped from asserting the statute of frauds. His rejoinder thus invokes principles of promissory or equitable estoppel.[3]

Illinois' doctrine of promissory estoppel traces closely the position adopted by the Restatement:

> The elements of promissory estoppel are: a promise unambiguous in terms, with reliance thereon by the promisee, with such reliance being expected and foreseeable by the promisor, and with the promisee in fact relying on the promise to his injury.... [I]n order to invoke the doctrine, the promisee's reliance must be reasonable and justifiable.

*Vincent Di Vito, Inc. v. Vollmar Clay Products Co.*, 179 Ill.App.3d 325, 327–28, 128 Ill.Dec. 393, 395, 534 N.E.2d 575, 577 (1989) (citations omitted); *see Restatement (Second) of Contracts* § 90(1) (1981); *see also Bank of Marion v. Robert "Chick" Fritz, Inc.*, 57 Ill.2d 120, 311 N.E.2d 138 (1974) (adopting first Restatement's position on promissory estoppel).

■ Promissory estoppel can be invoked in a contract setting as well as in a noncontract setting. If one party offers something to another party, without requiring consideration in return, the gratuitous promise might nevertheless prove enforceable if the promisee acts to her detriment in reasonable reliance on the promise. *See,*

*e.g., Restatement (Second) of Contracts* § 90 comment a, illustration 1 (1981); *Bank of Marion*, 57 Ill.2d at 124–25, 311 N.E.2d at 140. But promissory estoppel can also arise in the contract setting when consideration is present—for example when the alleged agreement does not exist in writing but one party has already acted in reliance on that agreement. *Gold v. Dubish*, 193 Ill.App.3d 339, 140 Ill.Dec. 9, 549 N.E.2d 660 (1989).

■ Geva attempts to invoke promissory estoppel in the context of an alleged contract. He insists promissory estoppel should allow the enforcement of the bilateral promises exchanged by the parties to this litigation: promises to employ and be employed for at least three years. The trial judge was correct in finding for the defendant on summary judgment, based on Geva's failure to present evidence of a promise on which he could reasonably rely.

Geva cannot win on his claim that an enforceable oral contract was formed by the two parties governing the duration of the employment relationship. Because Geva presented no writings evidencing the contract, the defendant justifiably asserted the statute of frauds as a defense to the alleged three-year contract. Geva's only response is that the defendant is estopped from pleading the statute of frauds because of its promise. Nevertheless, to invoke promissory estoppel Geva must still show at a minimum the existence of a promise on which he might reasonably have relied. He has neither alleged nor suggested proof of such a promise.

■ In the course of this litigation, Geva has not, it appears, averred that anyone employed by Leo Burnett ever discussed employment duration with him. In fact, the only source of a three year term to which Geva points is the paragraph in Leo Burnett's letter to the INS.[4] A written

---

3. As we have earlier noted, Illinois at one time maintained a distinction between promissory and equitable estoppel, but those doctrines seem to overlap in great part today. *See R.S. Bennett & Co. v. Economy Mechanical Indus., Inc.*, 606 F.2d 182, 187 n. 5 (7th Cir.1979) (citing cases);

*see also Gold v. Dubish*, 193 Ill.App.3d 339, 347–48, 140 Ill.Dec. 9, 13, 549 N.E.2d 660, 664 (1989) (no practical difference between doctrines).

4. There is language in Geva's brief on appeal which suggests that attorneys at the firm helping with his visa petition discussed a three year

memorandum signed by the defendant can be used by the plaintiff to avoid a statute of frauds defense.[5] But Geva did not present such an argument, in all likelihood because there were no agreements on which to base an oral contract claim. Standing alone, Leo Burnett's petition to the INS representing its intention to employ Geva for three years does not constitute a promise on which Geva could reasonably rely. *Restatement (Second) of Contracts* § 2(1) (1981) ("A promise is a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made."). *Cf. Williams v. Superior Court of San Diego County*, 216 Cal.App.3d 378, 264 Cal.Rptr. 677 (1989) (in action for oral contract, trial court did not abuse discretion in disregarding employer's representation to INS of three year expected employment of plaintiff). Leo Burnett made its statement to the INS to procure a visa for a prospective employee who had already quit his prior job, with no intention that Geva rely upon the representation. Geva simply has not alleged or presented sufficient facts to justify submitting his promissory estoppel theory to the trier of fact.

By deciding the promissory estoppel issue in this manner, we decline defendant's invitation to attempt to divine, yet again, the boundary between Illinois' promissory estoppel doctrine and the statute of frauds. In the now aging decision in *Sinclair v. Sullivan Chevrolet Co.*, 31 Ill.2d 507, 202 N.E.2d 516 (1964), the Illinois Supreme Court reiterated its position that the doctrine of equitable estoppel could not be used to overcome a statute of frauds defense without some proof that the broken promise was in fact a misrepresentation of the promisor's intention at the time it was issued. As noted above, the modern doctrine of promissory estoppel of course contains no such element of misrepresentation. Some Illinois courts after *Sinclair*, however, assumed that promissory estoppel would acquire a misrepresentation dimension when used to overcome a defense based on the statute of frauds. *See, e.g., Libby–Broadway Drive–In, Inc. v. McDonald's System, Inc.*, 72 Ill.App.3d 806, 28 Ill.Dec. 802, 391 N.E.2d 1 (1979). In the two and one-half decades since *Sinclair*, promissory estoppel experienced growth, and a separate codification of the statute of frauds—under the Uniform Commercial Code's article on sales, Ill.Rev.Stat. ch. 26, ¶ 2–201 (1989)—took a carefully circumscribed form. The combination of these developments led this court in *R.S. Bennett & Co. v. Economy Mechanical Indus., Inc.*, 606 F.2d 182 (7th Cir.1979), to reject the misrepresentation requirement when promissory estoppel was invoked to sustain an oral sales contract. Later, however, in *Evans v. Fluor Distribution Cos.*, 799 F.2d 364 (7th Cir.1986), this court suggested that *Bennett*'s result might be limited to UCC cases, given several Illinois appellate court decisions in the 1970s that continued to follow *Sinclair* outside the sales context.

Our attempted reconciliation of Illinois case law may be premature, as the narrowing and questioning of the *Sinclair* rule goes on in the Illinois Appellate Court. Notwithstanding *Evans*, one Illinois court investigating a non–UCC issue lamented

---

commitment with him. Appellant's Br. at 17–18. These "hints" are without support in either Geva's affidavit or his deposition, however, and the order for summary judgment likewise recounted no such discussion. Conclusory statements in Geva's affidavit, asserting that he would have accepted the job offer only if it included a three year commitment, do nothing to alleviate the problem with his showing. Promissory estoppel requires reasonable reliance on a promise given by the defendant.

**5.** Surprisingly, Geva neglected to assert, either below or on appeal, that the written petition to the INS constituted a "memorandum … signed by the party to be charged," sufficient to remove the contract from the statute of frauds. Ill.Rev. Stat. ch. 59, ¶ 1 (1989). Contrary to defense counsel's remarks at oral argument, a written memorandum signed by the party to be charged confirming the essential terms of the otherwise unwritten agreement might satisfy the statute of frauds, regardless of the memorandum's intended recipient or purpose. *Gaines v. McAdam*, 79 Ill.App. 201, 207–08 (1898); *see also Champion Home Builders Co. v. Jeffress*, 352 F.Supp. 1081, 1084–85 (E.D.Mich.1973), *rev'd on other grounds*, 490 F.2d 611 (6th Cir.1974).

the continuing conflict among Illinois precedents on the interaction of promissory estoppel and the statute of frauds. *Phillips v. Britton,* 162 Ill.App.3d 774, 785, 114 Ill.Dec. 537, 545, 516 N.E.2d 692, 700 (1987). Later still, another Illinois appellate decision, *Derby Meadows Utility Co. v. Inter–Continental Real Estate,* 202 Ill. App.3d 345, 147 Ill.Dec. 646, 559 N.E.2d 986 (1990), allowed the plaintiff to invoke promissory estoppel to obviate a statute of frauds defense outside the sales context. *See also Gold,* 193 Ill.App.3d 339, 140 Ill. Dec. 9, 549 N.E.2d 660 (in sale of business, promissory estoppel is available despite statute of frauds defense); *Restatement (Second) of Contracts* § 139 comment a & illustrations 1 and 2 (section on statute of frauds recognizing that promissory estoppel survives statute of frauds defense). For an interesting review of this issue, see Judge Posner's opinion for the court in *Monetti, S.P.A. v. Anchor Hocking Corp.,* 931 F.2d 1178, 1186 (7th Cir.1991). All this having been said, however, we agree with the district court that Geva showed no promise by Leo Burnett on which he could reasonably have relied. It is, therefore, unnecessary to speculate on the ultimate durability of *Sinclair* as an interpretation of Illinois law.

■ Geva's employee handbook claim must fail as well. From our review of the record, it does not appear that the claim was properly preserved below. Plaintiff apparently failed to present it in his response to defendant's motion for summary judgment (leading the district court to ignore the issue altogether in its disposition). Defendant, in turn, chose not to argue waiver, however, so there is waiver of the waiver and we must treat the issue on the merits.

■ The employee manual Geva received on his first day of work contained a "Performance Evaluation Policy," a one-page statement of Leo Burnett's plan to provide regular formal and informal feedback for employees. From this policy Geva argues that his employment was improperly terminated without the procedures required by his contract with Leo Burnett.

The Illinois Supreme Court recently accepted employee handbooks as potential sources of employment contract terms. *Duldulao v. St. Mary of Nazareth Hospital Center,* 115 Ill.2d 482, 106 Ill.Dec. 8, 505 N.E.2d 314 (1987). The opinion in *Duldulao* set out three requirements for a handbook to rise to the level of a contract: (1) the language of the policy statement must contain a promise clear enough that an employee would reasonably believe that an offer has been made; (2) the statement must be disseminated in such a way that the employee is aware of its contents and reasonably believes it to be an offer; and (3) the employee must accept the offer by commencing or continuing to work after learning of the policy statement. *Id.* at 490, 106 Ill.Dec. at 12, 505 N.E.2d at 318.

■ Reviewing the evidence presented by the plaintiff, we believe that summary judgment for defendant was appropriate on this claim. First, the handbook requires nothing of Leo Burnett as a predicate to terminating an employee. By disseminating the evaluation policy, the company bound itself at most to establishing some periodical review and feedback program. Even if Geva had been terminated after four months with no feedback whatsoever (a fact Leo Burnett contested below), no clear promise found in the policy would have been broken. More important, the remedy Geva seeks in this case is inappropriate to the promises he alleges were contained in the handbook. In his complaint Geva seeks damages compensating him for the three years' wages he would have earned at Leo Burnett. He does not seek reinstatement with back pay. Even had the handbook promised a full scale hearing before termination, such a provision would not transform Geva's at-will employment into one for a term. *Cf. Land v. Michael Reese Hospital & Medical Center,* 153 Ill. App.3d 465, 466, 469, 106 Ill.Dec. 470, 471, 473, 505 N.E.2d 1261, 1262, 1264 (1987). The error of which Geva complains—failure to provide promised procedures before termination—could not in the context of at-will employment allow him recovery for lost future wages.

### III.

Because of our disposition above, we need not consider Leo Burnett's other defense, namely that the waiver signed by Geva expressly left his employment terminable at will. For these reasons, the judgment of the district court is

AFFIRMED.