**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 18a0405n.06

Case No. 17-2366

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Aug 14, 2018
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| CARLOS HUMBERTO PEREZ MOSQUERA, | ) ) ) | |
| Plaintiff-Appellant, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN |
| v. | ) ) | |
| MTI RETREADING COMPANY, | ) ) | **OPINION** |
| Defendant-Appellee. | ) | |

BEFORE: COOK, STRANCH, and NALBANDIAN, Circuit Judges.

NALBANDIAN, Circuit Judge. Plaintiff Carlos Humberto Perez Mosquera ("Perez") worked as a supervisor in Defendant MTI Retreading's ("MTI") tire-retreading plant from April 2012 until April 2015. He filed a two-count complaint alleging that MTI violated the Fair Labor Standards Act ("FLSA") by not paying him overtime wages and breached an employment contract by terminating him prematurely. MTI moved for summary judgment on both counts. First, it argued that Perez was not entitled to overtime wages because he was exempt under the FLSA, and second, that his H-1B visa application could not form the basis of an employment contract. The district court granted MTI's motion for summary judgment on both counts, and for the following reasons, we affirm.

**I.**

MTI retreads tires. It is a franchisee of the Michelin company and employs approximately twenty employees including operators, supervisors, and a plant manager. Operators work a rather

routine job, transitioning tires through "posts" where the tires receive a variety of treatments. Each operator typically works a single machine at one or two posts, and it is common for operators to work from the same one or two posts for thirteen or fourteen years. Operators are not expected to have any retreading or engineering knowledge upon hire. Nor are they expected to have an advanced education. In fact, none of MTI's operators possess more than a high school diploma or GED. Operators typically earn between $8.50 and $11.00 per hour upon hire, but the most senior operators can earn approximately $13.50 to $14.50 per hour. Operators are classified as non-exempt under the FLSA and receive overtime pay. During the slow season, full-time operators earn as little as $300 a week. But during the busy season, when operators work six days a week and earn overtime pay, the most senior operators earn as much as $700 or $800 per week.

Supervisors do what their title suggests—they supervise operators. Unlike operators, supervisors are not assigned one machine; rather, they are expected to be familiar with all the machines. This is because they are tasked with a mix of managerial and technical duties, such as training and assigning operators, ensuring that production and quality standards are met, resolving "bottlenecks," and reviewing each operator's individual productivity reports daily to maximize efficiency and output. In addition, there was testimony that supervisors hire, discipline, and fire operators as needed. Supervisors are paid a salary and are not eligible for overtime or production bonuses. New supervisors earn approximately $750 per week, and their pay may be increased periodically based on market conditions.

MTI's plant manager is Jose Rojas. He is a degreed engineer from Colombia and is responsible for running the plant's operations. Perez enters the picture in 2011, when Rojas and MTI's owners began discussing the possibility of adding a night, or second, shift at the plant. Perez, like Rojas, is a degreed engineer from Colombia. Rojas contacted Perez because he wanted

him to supervise the second shift at MTI, and because he was seeking to boost MTI's engineering talent.

On August 30, 2011, Rojas sent Perez an email proposing the terms of his employment. The email stated that Perez would receive a salary of $750 per week to work as a supervisor without any potential for bonuses. Shortly after receiving the email, Perez began to seek employment with MTI and MTI began the process of sponsoring an H-1B visa for Perez. Accordingly, MTI submitted an I-129 to the government that included information about Perez's employment.

When he started at MTI, Perez signed an employment application indicating that he would be an "at-will" employee. Specifically, the application required him to agree that his "employment and compensation [could] be terminated, with or without cause, and with or without notice, at any time, at either [his] or [MTI's] option." R. 82-13, Employment Appl. at PageID #1156. Perez worked at MTI for the entire three-year term initially authorized by his visa. In 2015, Perez's pay was increased from $750 per week to $880 per week, and MTI successfully sought an extension of his visa for an additional three-year term. But on April 28, 2015, Rojas and Perez had an altercation and Perez left the plant. Rojas claims he simply told Perez "not [to] come back that day." Perez, however, claims that Rojas fired him after their altercation ended and told him "to leave and never come back again." What is undisputed is that Perez never returned to work at MTI after the altercation. Sometime later, Perez brought this suit alleging that MTI violated the FLSA by not paying him overtime wages and breached his employment contract by prematurely terminating him. MTI moved for summary judgment arguing that Perez was exempt from receiving overtime pay under the FLSA and that Perez did not have an employment contract with MTI. The district court granted MTI's motion for summary judgment on both counts.

**II.**

We review an order granting summary judgment de novo. *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* (quotation omitted); *see also* Fed R. Civ. P. 56(c)(1). When deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the non-moving party. *Tysinger*, 463 F.3d at 572. A "genuine dispute," however, must be based on evidence that a reasonable jury could return a verdict in favor of the non-moving party. *Id.*

**III.**

Under the FLSA, employees who work more than forty hours per week are entitled to overtime compensation of at least one and one-half times their regular rate of pay. 29 U.S.C. § 207(a)(1). Employees who work in a "bona fide" executive or professional capacity, or some combination of the two, however, are exempt from the FLSA's overtime pay requirements. *See* 29 U.S.C. § 213(a)(1); 29 C.F.R. § 541.708. The FLSA overtime exemptions are affirmative defenses "on which the employer has the burden of proof." *Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97 (1974). In construing these exemptions, we give them a "fair (rather than a 'narrow') interpretation." *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018) (quoting A. Scalia & B. Garner, *Reading Law* 363 (2012)).[1]

---

[1] We note that previous decisions of this Court have "narrowly construed" FLSA exemptions "against the employers seeking to assert them." *See, e.g.*, *Barks v. Silver Bait, LLC*, 802 F.3d 856, 860 (6th Cir. 2015); *Martin v. Ind. Mich. Power Co.*, 381 F.3d 574, 578 (6th Cir. 2004); *Chao v. Double JJ Resort Ranch*, 375 F.3d 393, 396 (6th Cir. 2004); *Douglas v. Argo–Tech Corp.*, 113 F.3d 67, 70 (6th Cir. 1997). But *Encino Motorcars* explicitly "reject[ed] this principle." 138 S.

Perez argues that he worked over forty hours per week at MTI but was unlawfully denied overtime pay. R. 1, Compl. at PageID #3. MTI counters that Perez was properly exempted from the FLSA's overtime pay requirements under the professional, executive, and combination exemptions. *See* Appellee Br. at 17. The trial court determined that Perez was exempt under the professional and combination exemptions, so he was not entitled to overtime pay. R. 93, Op. and Order at PageID #1819.

An employee qualifies as a professional under the FLSA if he earns a salary of at least $455 per week and has, as his "primary duty," the performance of work "[r]equiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction." 29 C.F.R. § 541.300(a) (2015).

It is undisputed that Perez was paid a salary of at least $455 per week. *See* Appellant's Corrected Br. at 14; Appellee Br. at 18 n.5. It is also undisputed that the supervisory role MTI *says* it hired Perez to fulfill would, theoretically, qualify under the professional exemption. "[W]ork requiring advanced knowledge" means work that is "predominantly intellectual in character" and involves "analyz[ing], interpret[ing], or mak[ing] deductions from varying facts or circumstances." 29 C.F.R. § 541.301(b). And Rojas's description of a supervisor's job indicates that supervisors are required to perform work satisfying that definition, such as resolving "bottlenecks" in production, training operators on machines, resolving issues with equipment, and monitoring production quotas and quality control. R. 82-3, Rojas Dep. at PageID #947, 954, 959, 963. Moreover, Rojas said he hires supervisors with engineering degrees because they "can be trained

Ct. at 1142; *Carley v. Crest Pumping Techs., LLC*, 890 F.3d 575, 579 (5th Cir. 2018) (explaining that, after *Encino Motorcars*, the FLSA's exemptions are not to be given "the narrow interpretation previously espoused by this and other circuits").

to successfully oversee a retreading operation without first obtaining several years of experience in retreading as would otherwise be a minimum requirement for such a role." R. 82-9, Rojas Aff. at PageID #1139. And "engineering" is specifically enumerated in the FLSA's regulations as "a field of science or learning." 29 C.F.R. § 541.301(c). In letters submitted in support of Perez's visa application, MTI's vice president explained that the company wished to hire Perez, who has an engineering degree, to boost the Company's engineering and technical prowess to fuel its growth. R. 90-18, Meekhof Letter 1, at PageID #1613; R. 90-19, Meekhof Letter 2, at PageID #1617. Finally, before Perez came to the United States to work for MTI, Rojas sent Perez an email informing him that among his objectives as a supervisor would be to perform tasks such as "monthly quality controls on each position" and "solve problems with employees, solve quality problems, and make presentations when clients visit." R. 82-5, Perez Dep. at Page ID #1083.

What Perez disputes is whether, in fact, it really was Perez's "primary duty" to work as a supervisor, as described by Rojas and MTI. *See* Appellant's Br. at 14. "The term 'primary duty' means the principal, main, major or most important duty that the employee performs," and is determined based on all the facts. 29 C.F.R. § 541.700(a). And the evidence in the record demonstrates that Perez had, as his "primary duty," the performance of work requiring the use of advanced knowledge.

We start with Perez's own statements describing his duties at MTI, which he included on his resume when he applied for a job with his current employer. Perez said he was responsible for, among other things, "overall planning, development, implementation, evaluation and control of all

6

production processes," and for providing "quality control overall [sic] production process."[2] R. 82-24, Resume at PageID #1248. He also indicated that throughout his time at MTI, he was considered an "[i]ndustrial [e]ngineer." *Id.*

But even aside from Perez's own representations, numerous affidavits submitted by Rojas and several operators attest to Perez working in a professional capacity at MTI. R. 82-9, Rojas Aff. at PageID #1140; R. 82-10, Stillwell Aff. at PageID #1144; R. 82-11, Lopez Aff. at PageID #1147. And when asked during his deposition, Rojas readily illustrated specific instances when Perez relied on his advanced engineering knowledge to help diagnose and find creative solutions to issues in the plant, such as: (1) working with Michelin to replace a manual bridge; (2) fixing a machine's cables to ensure they would not break its other parts; (3) developing a special rim for a particular type of tire; (4) identifying a bottleneck issue that he resolved with Rojas; and (5) developing a management control system. *See* R. 82-3, Rojas Dep. at PageID #974–77.

Furthermore, Perez is completely silent about why MTI would pay him substantially more money than its most senior operators (and bring him to the United States from Colombia) if he was only an operator. This undermines his case because "the relationship between [an] employee's salary and the wages paid to [nonexempt] employees" is a "[f]actor[] to consider when determining the primary duty of an employee." 29 C.F.R. § 541.700(a). As mentioned, full-time operators earned as little as $300 during MTI's slow season, but the most senior operators earned up to $700 or $800 dollars, including overtime pay, during MTI's busy season. R. 82-7, Moblo Dep. at PageID #1133; R. 82-6, Stillwell Dep. at PageID #1127. Perez, however, was paid a *starting* salary

---

[2] Perez now says that his resume does not accurately reflect the work he performed at MTI. R. 82-5, Prez Dep. at PageID #1080 ("Q. You applied for a job using a resume that misrepresented what you did at your previous employer? A. Exactly, yes.").

of $750 dollars per week, and like other supervisors, his pay could increase based on market conditions. R. 82-5, Perez Dep. at PageID #1098. In 2015, after working at MTI for only three years, Perez began earning $880 per week, which was more than any operator received, including overtime, on a weekly or annual basis. *See id.*; R. 82-6, Stillwell Dep. at PageID #1127; R. 82-7, Moblo Dep. at 1133; R. 82-8, Lopez Dep. at Page ID #1136–37. MTI provided over 100 pages of Perez's time reports indicating that he earned on average more than twice as much as he would have earned at a normal starting hourly wage as an operator, including overtime pay. *See* Appellee's Br. at 21; R. 91-7, Pl.'s time records at PageID #1667–1798. As MTI points out in its brief, "[e]ven if MTI had hired [Perez] to be an operator . . . and had chosen to start him at the same wage as a 13-year veteran, [Perez's] actual salary was still 78% greater in 2015 than he would have been paid." *See* Appellee's Br. at 21. It makes little sense that Perez would have been paid the supervisor's salary he was paid unless he really was the supervisor those who worked with him say he was. *See Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 509 (6th Cir. 2007) (finding that an exempt employee's salary "equated to a significant amount . . . more" than a nonexempt employee's salary because it was greater by thirty percent).

Despite all this evidence that MTI amassed in support of its motion for summary judgment, Perez contends that there remains a genuine issue of material fact that prevents us from concluding he worked in a professional capacity for MTI. His entire argument is based on his "best guess" that at least ninety-five percent of what he did at MTI was the same work the operators performed. *See* Appellant's Corrected Br. at 15; R. 90, Resp. in Opp'n of Mot. for Summ. J. at PageID #1345; R. 91-2, Perez Dep. at PageID #1636. Although estimates of how employees spend their time are relevant when determining their primary duty, *see, e.g.*, *Schaefer v. Ind. Mich. Power Co.*, 358 F.3d 394, 401 (6th Cir. 2004); *Burton v. Appriss, Inc.*, 682 F. App'x 423, 428 (6th Cir. 2017), our

court has repeatedly said that unsubstantiated, self-serving assertions will not preclude an adequately supported motion for summary judgment from being granted. *See Ondo v. City of Cleveland*, 795 F.3d 597, 605 (6th Cir. 2015) ("Statements made on belief or on information and belief, cannot be utilized on a summary-judgment motion.") (citation and internal quotations omitted); *Bradley v. Wal-Mart Stores*, *E., LP*, 587 F. App'x 863, 866 (6th Cir. 2014) ("A properly supported motion for summary judgment will not be defeated by conclusory allegations, speculation and unsubstantiated assertions."); *see also L.F.P.IP, LLC v. Hustler Cincinnati, Inc.*, 533 F. App'x 615, 620 (6th Cir. 2013) (explaining that a party's "self-serving" testimony, viewed in light of his sworn statements to the contrary, "fail[ed] to present a *genuine* issue of fact"). And our position is consistent with the general view among other circuits. *See, e.g.*, *Stein v. Ashcroft*, 284 F.3d 721, 726 (7th Cir. 2002) ("Bald and self-serving assertions . . . unsubstantiated by any documentation or other testimony, are not sufficient to create a material issue of fact . . . ."); *Smith v. Sw. Bell Tel. Co.*, 456 F. App'x 489, 492 (5th Cir. 2012) ("[W]e have repeatedly held that self-serving statements, without more, will not defeat a motion for summary judgment, particularly one supported by plentiful contrary evidence.") (collecting cases); *Curley v. Adams Creek Assocs.*, 409 F. App'x 678, 680 (4th Cir. 2011) (explaining that a resident's "vague, unsubstantiated, and self-serving allegations" were insufficient to create fact issue necessary to survive summary judgment on her claim of adverse possession).

Moreover, Perez's "best guess" does not change our analysis because:

Time alone . . . is not the sole test, and nothing . . . requires that exempt employees spend more than 50 percent of their time performing exempt work. Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion.

29 C.F.R. § 541.700(b).

MTI's motion for summary judgment is compelling based on (1) Rojas's deposition explaining how Perez successfully used his engineering background to fulfill his supervisory role, (2) Perez's own resume indicating that the use of his engineering skills were among his most important responsibilities at MTI, (3) the affidavits of several operators attesting that Perez's work was different from theirs, and (4) the significant pay disparity between Perez and MTI's operators. This evidence, combined with Perez's inability to provide *any* corroborating evidence to support his "best guess," compels us to conclude that there is no genuine dispute that Perez was exempt under the FLSA's professional exemption. Accordingly, we need not decide whether Perez was also exempt under the FLSA's executive or combination exemptions.

## IV.

Perez's second claim is that MTI breached his alleged employment contract by terminating him on April 25, 2015.[3] MTI disputes that it ever entered into an employment contract with Perez and has submitted Perez's employment application, which shows that he signed an "at-will" statement. R. 82-13, Employment Appl. at PageID #1155–56. Perez's theory is that his H-1B visa constitutes a contract between, at the very least, MTI and the Government, to which Perez was a third-party beneficiary, and that modified the terms of his at-will employment status. *See* Appellant's Br. at 22–26. Alternatively, Perez argues that he can recover damages based on promissory estoppel. *Id.* at 26–29. Perez's arguments fail for several reasons.

## A.

Perez first argues that the H-1B visa that MTI sponsored to bring him to Michigan constitutes a valid contract that entitles him to damages. "In Michigan, the essential elements of a

---

[3] MTI disputes that Perez was fired and claims instead that he "walked off the job." *See* Appellee's Br. at 3. Either way, this factual dispute is immaterial to our analysis.

valid contract are (1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." *Thomas v. Leja*, 468 N.W.2d 58, 60 (Mich. Ct. App. 1991). A supposed contract based on H-1B visa materials fails to satisfy several of these elements. For example, in *Rao v. Covansys Corp.*, the plaintiff-employee made the identical argument that his H-1B visa constituted a valid contract that his employer, the defendant, breached. No. 06 C 5451, 2007 WL 3232492, at *3 (N.D. Ill. Nov. 1, 2007) (construing Illinois law). The court rejected the argument, reasoning that because employers hiring certain foreign workers are required by law to apply for an H-1B visa, an H-1B visa application lacks "legally cognizable consideration." *See id.* at *4 ("A party's agreement to do or refrain from doing something that it is already legally obligated to do or refrain from doing is not consideration."); *see also Panwar v. Access Therapies, Inc.*, 975 F. Supp. 2d 948, 959 n.1 (S.D. Ind. 2013) (construing Indiana law and suggesting that an H-1B visa application cannot give rise to mutuality of agreement or mutuality of obligation because "it is not contractual in nature between the employee and the employer"). Absent controlling authority, we take our cue from the few courts that have addressed this issue, all of which have found that an H-1B visa does not give rise to a valid contract between an employer and employee. *See, e.g.*, *Shibeshi v. Philander Smith Coll.*, No. 11 CV00513, 2011 WL 4529455, at *2 (E.D. Ark. Sept. 30, 2011) (construing Arkansas law), *aff'd*, 467 F. App'x 544 (8th Cir. 2012); *Hui Luo v. L & S Acupuncture, P.C.*, No. 14 Civ. 1003, 2015 WL 1055084, at *7 (E.D.N.Y. Jan. 23, 2015) (construing New York law); *Khanna v. Grandparents Living Theatre, Inc.*, No. 96APE12-1744, 1997 WL 599930, at *3 (Ohio Ct. App. Sept. 25, 1997) (construing Ohio law).

**B.**

Perez also argues, in the alternative, that even if we find his H-1B visa application does not constitute a valid contract, he is still entitled to damages based on promissory estoppel principles. *See* Appellant Br. at 29. He claims that he detrimentally relied on the "promises" contained in his H-1B visa application and supporting documents, as evidenced by the fact that he left his home country to begin working for MTI in the United States. *Id.* In Michigan, the elements of a promissory estoppel claim consist of: "(1) a promise, (2) that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of the promisee, (3) which in fact produced reliance or forbearance of that nature, (4) in circumstances such that the promise must be enforced if injustice is to be avoided." *McMath v. Ford Motor Co.*, 259 N.W.2d 140, 142 (Mich. Ct. App. 1977). We find there was no promise to begin with because nothing in an H-1B visa application or its supporting documents "evince[s] [an] intention on the part of [MTI] to assume a mandatory obligation that could support a viable claim of promissory estoppel." *Rao*, 2007 WL 3232492, at *4; *see also Geva v. Leo Burnett Co.*, 931 F.2d 1220, 1223–24 (7th Cir. 1991) (construing Illinois law) (employee had not shown that his visa documents constituted "the existence of a promise on which he might reasonably have relied" to invoke relief based on promissory estoppel). Without a promise, Perez is not entitled to relief based on promissory estoppel. *See Zaremba Equip., Inc. v. Harco Nat'l Ins. Co.*, 761 N.W.2d 151, 166 (Mich. Ct. App. 2008).

**V.**

In sum, we **AFFIRM** the district court's grant of summary judgment on **Count I** seeking overtime wages based on the FLSA because Perez was exempt under the bona fide professional

exemption. We also **AFFIRM** the district court's grant of summary judgment for **Count II** because Perez has not presented a cognizable breach of contract claim.