DERBY MEADOWS UTILITY COMPANY, INC., Plaintiff-Appellant, v. INTER-CONTINENTAL REAL ESTATE *et al.*, Defendants-Appellees.—DERBY MEADOWS UTILITY COMPANY, INC., Plaintiff-Appellant, v. THE VILLAGE OF ORLAND PARK, Defendant-Appellee (Camelot Homes *et al.*, Intervenors-Appellees).—DERBY MEADOWS UTILITY COMPANY, INC., Plaintiff-Appellant, v. THE VILLAGE OF ORLAND PARK, Defendant-Appellee (Camelot Homes *et al.*, Intervenors).

First District (6th Division) Nos. 1—89—1612, 1—89—1613, 1—89—2064 cons.

Opinion filed August 17, 1990.

Ross & Hardies, of Chicago (Jeffrey M. Cross and P. Matthew Glavin, of counsel), for appellant.

Pope, Ballard, Shepard & Fowle, Ltd., and Jack M. Siegel, both of Chicago (Paul E. Freehling and Catherine P. Wassberg, of counsel), for appellees.

JUSTICE RAKOWSKI delivered the opinion of the court:

Derby Meadows Utility Co., Inc. (Derby Meadows), appeals from several orders of the circuit court of Cook County dismissing its claims against the Village of Orland Park (Village) for tortious interference with various real estate contracts as well as its claims against the respective real estate companies for specific performance. The issues on appeal are: (1) whether the trial court erred in granting summary judgment in favor of Camelot Homes, Inc. (Camelot Homes), based on the Statute of Frauds (Ill. Rev. Stat. 1987, ch. 59, par. 1 *et seq.*); (2) whether the dismissal of the tortious interference claim against the Village based on the finding that the Camelot Homes' contract was unenforceable was error; (3) whether the trial judge erred in dismissing Derby Meadows' complaint against Inter-Continental Real Estate and Development Corporation (Inter-Continental) and Orchard Hill Building Company (Orchard Hill) for failure to state a cause of action; and (4) whether the trial judge erred in granting sum-

mary judgment for the Village on the tortious interference claim regarding the Inter-Continental contract. We affirm in part and reverse and remand in part.

This consolidated appeal involves multiple parties and claims which were litigated before three judges. In order to clarify the issues, a description of the parties as well as the events leading to the various claims is presented below.

Derby Meadows is a privately owned public utility company which, until 1980, had only provided water and sanitary sewer service to Will County. In 1980 Derby Meadows expanded its service area into southwestern Cook County, which approached the boundaries of the Village. Thereafter, Derby Meadows and the Village became competitors for the sale of water and sewer services to customers located near the Village.

As a public utility company, Derby Meadows is subject to regulation by the Illinois Commerce Commission, and pursuant to section 8—406 of the Public Utilities Act (Ill. Rev. Stat. 1985, ch. 111⅔, par. 8—406(a)), it is required to obtain a certificate of public convenience and necessity in order to conduct business in the State. Anthony Perino is the president of Derby Meadows.

### THE UTILITY SERVICE CONTRACT FOR CREEKSIDE

Inter-Continental is a real estate and development corporation whose president is Michael Halikias. Creekside is a parcel of property located near the boundaries of the Village. Prior to October 1980, Creekside was owned by Tope Corporation. Anthony Perino, who is the owner of Derby Meadows, is also the owner of Tope Corporation. On October 30, 1980, Inter-Continental purchased Creekside from Tope Corporation. At the time that the sale of Creekside was executed, Inter-Continental also signed a document entitled "Agreement To Extend Sewer And Water Service Lines And Establishing Tap-In Charges." The agreement required Derby Meadows to construct water and sewer lines for service to the development, and it required Inter-Continental to pay a tap-in charge for connection to Derby Meadows' utility system either when Inter-Continental completed the on-site improvements or when Derby Meadows completed its trunk line, whichever occurred first. Derby Meadows completed its trunk line for the Creekside property in 1985. According to an affidavit filed by Perino, Derby Meadows requested payment of the sewer connection fee during the period between 1985 and 1987, and he was assured by Halikias that Inter-Continental would honor their agreement. However, in the fall of 1987 Halikias informed Perino that Inter-Con-

tinental would not honor their agreement and would not pay the connection fee.

Derby Meadows subsequently learned that Robert Gallagher and his company Orchard Hill were negotiating with Inter-Continental for the purchase of the Creekside property. At that time, Derby Meadows provided Orchard Hill with a copy of its utility service agreement with Inter-Continental and informed Gallagher that this agreement would be binding on his company if Orchard Hill purchased Creekside.

In December 1987 Inter-Continental signed an agreement with Orchard Hill for the sale of Creekside. On February 18, 1988, Derby Meadows filed a complaint against Inter-Continental for breach of contract and specific performance. Derby Meadows also filed a *lis pendens* notice on the Creekside property concerning its lawsuit against Inter-Continental. In March 1988, a rider to the real estate contract between Inter-Continental and Orchard Hill was executed which provided that the purchaser, Orchard Hill, rather than the seller, Inter-Continental, would be obligated for the payment of connection fees or sewer payments for the provision of water and sanitary sewer services provided by Derby Meadows.

### THE UTILITY SERVICE CONTRACT FOR PINEWOOD NORTH

Camelot Homes is a real estate development company whose president is Robert Kaup. Camelot Homes owns a parcel of real estate in southwestern Cook County near the Village boundaries which is known as Pinewood North.

During 1986-87 Kaup and Perino met and discussed the provision of water and sanitary sewer services by Derby Meadows for the proposed subdivision known as Pinewood North. The conversations between Kaup and Perino included a discussion of the terms under which Derby Meadows would provide the sewer and water service to the property, including the price, method of providing service, the time for service connections as well as joint efforts to obtain approval from the Illinois Commerce Commission. At the end of the meeting Perino asked Kaup if they had a deal, and Kaup replied, "We have a deal." Kaup then told Perino to "get going on it," and they shook hands. Perino then retained counsel to initiate a petition with the Illinois Commerce Commission to obtain a certificate of public convenience and necessity to provide service. The petition was to have included a written memorialization of the agreement between Kaup and Perino. At the March 20, 1987, hearing of the Cook County Zoning Board of Appeals, Camelot Homes' engineer stated that Derby Meadows would be providing the water and sewer service to the site, and

at the Village plan commission meeting, Kaup and the engineer presented Pinewood North subdivision plans which showed water and sewer connections to Derby Meadows' facility. One of Kaup's attorneys also stated in a letter to the Village planner that Camelot Homes had an understanding with Derby Meadows for the provision of water and sewer service. On August 20, 1987, Kaup told Derby Meadows' attorneys that Camelot Homes and Derby Meadows had a "handshake deal." However, despite its acknowledgement of the agreement, Camelot Homes refused to perform. On February 18, 1988, Derby Meadows filed a suit against Camelot Homes alleging breach of contract and seeking specific performance.

### THE TORTIOUS INTERFERENCE ACTION

The Village is a municipality in southwestern Cook County. In 1980 the Village obtained the right to purchase and resell Lake Michigan water. At this time the Village expanded its water lines and installed sanitary sewer lines in order to provide sewer service and Lake Michigan water to customers both within and outside the Village boundaries.

Pursuant to section 11—12—5 of the Illinois Municipal Code (Ill. Rev. Stat. 1985, ch. 24, par. 11—12—5), the Village has the right to review and approve as well as give input into the character and design of plats of development on property located within 1½ miles of its boundaries. The real estate developments involved in these proceedings are located within this 1½-mile area. Unlike Derby Meadows, the Village, as a municipality, is not required to obtain a certificate of public convenience and necessity to provide water and sewer service.

Because the Creekside property owned by Inter-Continental and the Pinewood North property owned by Camelot Homes were both located within 1½ miles of the corporate boundaries of the Village, the Village's approval was required before the properties could be developed. The Village learned of Derby Meadows' agreements with Inter-Continental and Camelot Homes when each of the developers applied for subdivision approval. However, neither property was approved for development prior to the refusal of Inter-Continental and Camelot Homes to honor their agreement with Derby Meadows. On September 28, 1987, Derby Meadows filed a suit alleging that the Village tortiously interfered with Derby Meadows' contract with Inter-Continental and Camelot Homes.

PROCEDURAL HISTORY

Judge Roger Kiley presided over the trial of Derby Meadows' lawsuit against the Village and found that Derby Meadows had a valid enforceable contract with Inter-Continental and Camelot Homes, and that the Village had tortiously interfered with the contracts. However, before Judge Kiley issued a written order, Camelot Homes and Orchard Hill filed petitions to intervene, claiming that their rights would be affected if an injunction order were entered. The trial court granted both petitions and ordered Derby Meadows to consolidate its specific performance lawsuits against Camelot Homes and Inter-Continental with its lawsuit against the Village. Following the consolidation of the cases, Inter-Continental moved for a change of venue which was granted. The specific performance claim against Inter-Continental was assigned to Judge Albert Green. However, Derby Meadows' tortious interference claims against the Village, including the tortious interference claim regarding the Inter-Continental contract, remained with Judge Kiley. Camelot Homes then brought a motion for summary judgment, claiming that its contract with Derby Meadows was unenforceable based on the Statute of Frauds. A briefing schedule and hearing date were ordered. Derby Meadows was also ordered to add Orchard Hill as a party defendant in the Inter-Continental case. On January 10, 1989, Derby Meadows filed its second amended complaint adding Orchard Hill as a defendant. Judge Kiley subsequently resigned from the bench, and the consolidated suits against the Village and Camelot Homes were assigned to Judge Monica Reynolds. On May 24, 1989, Judge Reynolds granted Camelot Homes' motion for summary judgment. Based on her finding that the Camelot Homes contract was unenforceable, Judge Reynolds entered an order dismissing Derby Meadows' tortious interference claim against the Village. These orders are the subject of appeal No. 1—89—1613. In the Inter-Continental case before Judge Green, both defendants filed motions to dismiss pursuant to section 2—615 of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—615), alleging that Derby Meadows' second amended complaint failed to state a cause of action. The trial court granted both motions. The order granting these motions is the subject of appeal No. 1—89—1612. The Village then filed a motion before Judge Reynolds, requesting the court to adopt Judge Green's dismissal orders and enter summary judgment in favor of the Village on the tortious interference claim regarding Derby Meadows' contract with Inter-Continental. The trial court granted the motion. This order is the subject of appeal No. 1—89—2064. The three appeals were subsequently consolidated.

I

■ Derby Meadows first contends that the trial court erred in granting Camelot Homes' motion for summary judgment because there were questions of fact as to whether its contract with Camelot Homes was unenforceable under the Statute of Frauds. When an order for summary judgment is reviewed, the only issue on appeal is whether " ' "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." ' (Ill. Rev. Stat. 1983, ch. 110, par. 2—1005.)" (*Lindenmier v. City of Rockford* (1987), 156 Ill. App. 3d 76, 85, 508 N.E.2d 1201, quoting *Wilmere v. Stibolt* (1987), 152 Ill. App. 3d 642, 646.) The granting of a motion for summary judgment is not a matter of discretion, and if no genuine issue exists, the motion should be granted and the cause terminated in the moving party's favor. *Manahan v. Daily News-Tribune* (1977), 50 Ill. App. 3d 9, 12, 365 N.E.2d 1045.

■ Camelot Homes' motion for summary judgment was granted based on the Statute of Frauds. The relevant portions of that statute provide:

"That no action shall be brought *** upon any agreement that is not to be performed within the space of one year from the making thereof, unless the promise or agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person thereunto by him lawfully authorized." (Ill. Rev. Stat. 1987, ch. 59, par. 1.)

Section 2 of the statute provides:

"No action shall be brought to charge any person upon any contract for the sale of lands, tenements or hereditaments or any interest in or concerning them, for a longer term than one year, unless such contract or some memorandum or note thereof shall be in writing, and signed by the party to be charged therewith, or some other person thereunto by him lawfully authorized in writing, signed by such party." Ill. Rev. Stat. 1987, ch. 59, par. 2.

Derby Meadows' first argument in support of its contention that the Statute of Frauds is inapplicable to the Camelot Homes' contract is that the record raises questions of fact as to whether Camelot Homes admitted the existence and material terms of the contract and, therefore, brought the agreement within a valid exception to the Statute of Frauds. Derby Meadows claims that Camelot Homes admitted

the existence of a contract in its pleadings and the sworn deposition of its president, Robert Kaup, and that these admissions were judicial admissions which created an exception to the Statute of Frauds defense.

In order to qualify as a judicial admission, the statement must be clear, unequivocal and within the party's personal knowledge. (*Kirby v. Jarrett* (1989), 190 Ill. App. 3d 8, 15, 545 N.E.2d 965, citing *Hansen v. Ruby Construction Co.* (1987), 155 Ill. App. 3d 475, 508 N.E.2d 301 (*Hansen I*).) Pursuant to Supreme Court Rule 212, a discovery deposition may be used as an admission by a party, its officer or agent in the same manner and to the same extent as any other admission made by that person. (107 Ill. 2d R. 212(a)(2); *Tom Olesker's Exciting World of Fashion, Inc. v. Dun & Bradstreet, Inc.* (1979), 71 Ill. App. 3d 562, 569, 390 N.E.2d 60.) In addition, a party's admission must be deliberate testimony relating to a concrete fact and not an inference or uncertain summary. *Tom Olesker's Exciting World of Fashion, Inc.*, 71 Ill. App. 3d at 569.

Derby Meadows claims that statements made by Camelot Homes in its answer to the complaint were judicial admissions. However, in Camelot Homes' answer, the statements to which Derby Meadows refers only admitted the occurrence of a discussion between Perino and Kaup as to the possible terms of a future contract. Some of the terms discussed were that Camelot Homes would assist Derby Meadows to obtain approval from regulatory agencies, that Camelot Homes offered to assume construction of on-site water and sewer facilities for the subdivision and that the preliminary discussion between Perino and Kaup was to culminate in a written contract to be used, "among other purposes," for Derby Meadows' application before the Illinois Commerce Commission. None of these statements were an unequivocal admission that the discussion resulted in a contract at that time. They were, at best, statements as to the possible terms of a future contract.

Derby Meadows also claims that the statements by Kaup in his deposition were judicial admissions. However, Kaup's deposition was taken as part of discovery in the tortious interference action against the Village in which Camelot Homes was not a party. Supreme Court Rule 212(a)(2) (107 Ill. 2d R. 212 (a)(2)) states that it is the statements in the discovery deposition of a party which can be used as an admission. (See also *Tom Olesker's Exciting World of Fashion, Inc.*, 71 Ill. App. 3d at 569.) Furthermore, Kaup's acknowledgement in his deposition that, at the end of his meeting with Perino, he shook hands with him and said that they had a deal was not a statement under oath

that he had a deal with Perino but was only a statement that he had this conversation with Perino at the time of their meeting. Additionally, Kaup's reference to his agreement with Perino as a "deal" was not an unequivocal statement regarding the existence of a contract, as opposed to the statements in the cases cited by Derby Meadows which directly referred to the particular transaction as a contract. See *Whildin v. Kovacs* (1981), 93 Ill. App. 3d 582, 417 N.E.2d 736; *Haas v. Cravatta* (1979), 71 Ill. App. 3d 325, 389 N.E.2d 226.

Derby Meadows also argues that the Statute of Frauds does not render its contract with Camelot Homes unenforceable because the contract could have been performed within one year. Derby Meadows claims that this could have occurred if it was denied a certificate of public convenience and necessity by the Illinois Commerce Commission, which could be a contingency factor precluding further performance of the contract. Because the denial of the certificate could have occurred within the year, performance of the contract would be completed at that time.

■ Although Derby Meadows cites *George F. Mueller & Sons, Inc. v. Northern Illinois Gas Co.* (1973), 12 Ill. App. 3d 362, 299 N.E.2d 601, and *Stein v. Malden Mills, Inc.* (1972), 9 Ill. App. 3d 266, 292 N.E.2d 52, in support of its argument, the contract at issue could only be outside the statute if it was capable of being fully performed within one year and not simply terminated by some contingency such as death or bankruptcy. (*Gilliland v. Allstate Insurance Co.* (1979), 69 Ill. App. 3d 630, 388 N.E.2d 68, citing *Sinclair v. Sullivan Chevrolet Co.* (1964), 45 Ill. App. 2d 10, 195 N.E.2d 250, *aff'd* (1964), 31 Ill. 2d 507, 202 N.E.2d 516.) In this case, the contingency to which Derby Meadows refers was the Illinois Commerce Commission's denial of the certificate of public convenience and necessity, which was a prerequisite for the performance of the contract. If Derby Meadows were unable to obtain the certificate, it could never perform on the contract. At this point, the contract would not just be terminated, as in *Stein* and *George F. Mueller & Sons*, but it would be a nullity. Therefore, denial of the certificate would not render the contract capable of performance within one year.

■ Derby Meadows also claims that its oral contract with Camelot Homes is divisible and that the provisions concerning water and sewer service did not require a writing. The question of whether a contract is severable is based on a determination of the intent of the parties. The factors considered are whether performance by one of the parties consists of separate and distinct functions and whether the price paid by the other party is apportioned to each function per-

formed. *Stratemeyer v. West* (1985), 136 Ill. App. 3d 1095, 1097, 484 N.E.2d 399; *Kaplan v. Keith* (1978), 60 Ill. App. 3d 804, 808, 377 N.E.2d 279.

■ The terms of the alleged oral contract between Derby Meadows and Camelot Homes were set forth in Derby Meadows' complaint. According to these terms, the performance by both parties consisted of similar or related actions which were directed toward the common goal of establishing water and sanitary sewer service for the Pinewood North property. In addition, the only term which referred to a specific price was item (b), which stated that Camelot Homes agreed to pay a tap-in connection charge of $1,700 per lot. The terms of this agreement were discussed at a single meeting between Kaup and Perino, and both parties' references to the agreement support the conclusion that the agreement was intended as a single transaction. Therefore, we conclude that the agreement between Camelot Homes and Derby Meadows is severable.

■ For the reasons set forth above, we conclude that Judge Reynolds properly granted Camelot Homes' motion for summary judgment based on the Statute of Frauds.

## II

Derby Meadows also contends that the trial court's dismissal of its claim agains the Village for tortious interference with the Camelot Homes contract was error. Subsequent to her finding that the Camelot Homes contract was unenforceable, Judge Reynolds entered an order that the Village and Derby Meadows were collaterally estopped from relitigating this issue. Judge Reynolds then dismissed the tortious interference claim regarding the Camelot Homes contract.

■ ■ The elements of a cause of action for tortious interference with a contract are the existence of a valid contract, the intentional and unjustified inducement of a party to breach his contractual obligation and the incurring of damages as a result of the breach. (*Mineral Resources, Inc. v. Classic Coal Corp.* (1983), 115 Ill. App. 3d 114, 450 N.E.2d 379.) Because Derby Meadows failed to establish that it had a valid enforceable contract with Camelot Homes, its claim against the Village for tortious interference with this contract also fails.

## III

Derby Meadows next contends that Judge Green erred in granting Inter-Continental and Orchard Hill's section 2—615 motions where Derby Meadows pleaded adequate facts in its second amended complaint to support a cause of action for breach of contract and promis-

sory estoppel. The second amended complaint contained three counts. Count I alleged that Inter-Continental breached the water and sewer contract concerning the Creekside property. Count II was a claim for promissory estoppel which alleged that Inter-Continental had represented that it would develop the Creekside property, purchase water and sewer services from Derby Meadows, and that Derby Meadows reasonably relied on these representations to its detriment. Count III stated a breach of contract claim against Orchard Hill as a contract purchaser of Creekside lots. Derby Meadows alleged that Orchard Hill had notice of the Inter-Continental contract and that the contract obligations would run with the land. Inter-Continental and Orchard Hill responded to the complaint by filing motions to dismiss pursuant to section 2—615 of the Code of Civil Procedure. Both motions were granted.

When a judgment appealed from is entered as a result of a motion to dismiss, all properly pleaded facts and all reasonable inferences from them will be regarded as true. (*Estate of Johnson v. Condell Memorial Hospital* (1988), 119 Ill. 2d 496, 499, 520 N.E.2d 37; *Ogle v. Fuiten* (1984), 102 Ill. 2d 356, 360, 466 N.E.2d 224.) To survive a motion to dismiss, a complaint must present a legally recognized claim as its basis for recovery, and it must plead sufficient facts which, if proved, would demonstrate a right to relief. *People ex rel. Fahner v. Carriage Way West, Inc.* (1981), 88 Ill. 2d 300, 308, 430 N.E.2d 1005.

In its second amended complaint, Derby Meadows alleged that on October 30, 1980, Tope Corporation through its trustee Marquette Bank contracted to sell its rights to the Creekside property to Inter-Continental, and that as part of the same transaction, Derby Meadows contracted with Inter-Continental to provide water and sanitary sewer utility services to Creekside. The utility service contract, which was incorporated into the pleadings, referred to the real estate contract between Tope Corporation and Inter-Continental. Under this contract, Derby Meadows was required to construct sewer and water lines to provide sewer and water utility services to Creekside. Inter-Continental was required to pay Derby Meadows a tap-in fee of $1,200 per unit for sewer capacity. The tap-in fee was due at the time that on-site improvements were completed by the developer or at the time that Derby Meadows completed its trunk line, whichever occurred first. Derby Meadows further alleged in the complaint that the trunk line was completed in 1985, but that Inter-Continental had refused and failed to perform on the utility service contract, including the payment of utility connection fees.

██ Inter-Continental argues that count I of the second amended complaint failed to state a cause of action because the well-pleaded allegations of plaintiff's complaint stated that, as of December 1987, Orchard Hill became the equitable owner of the Creekside property by virtue of the contract for sale. However, even though the complaint made reference to negotiations between Inter-Continental and Orchard Hill regarding the sale of Creekside, the allegations identified Inter-Continental as the owner of the property, and this fact must be taken as true for purposes of a section 2—615 motion. Furthermore, although Derby Meadows made reference to the real estate contract and rider in count III of the complaint, which alleged a cause of action against Orchard Hill, the 1987 document only contained the signature of the trustee purchaser, Standard Bank and Trust Company, acting on behalf of Orchard Hill. The signature of Steel City National Bank on behalf of Inter-Continental did not appear on the document until March 1988. For these reasons, we conclude that Derby Meadows' complaint alleged sufficient facts to support its claim that Inter-Continental was the owner of Creekside when the complaint was initially filed in February, 1988.

Inter-Continental also argues that the utility service agreement with Derby Meadows was not a contract. However, in its second amended complaint, Derby Meadows set forth the parties to the agreement, the terms of performance, consideration and the time period in which performance was to occur. These allegations were sufficient to support Derby Meadows' claim that the utility service agreement was a contract.

We, therefore, conclude that count I of Derby Meadow's second amended complaint properly pleaded a cause of action for breach of contract against Inter-Continental.

██ Count II of Derby Meadows' second amended complaint was a promissory estoppel claim against Inter-Continental. A cause of action in promissory estoppel must allege an unambiguous promise, reliance thereon by the party to whom the promise is made, injury resulting from this reliance and the foreseeability of this reliance by the party making the promise. (*Bolden v. General Accident, Fire & Life Assurance Corp.* (1983), 119 Ill. App. 3d 263, 266, 456 N.E.2d 306.) In its complaint, Derby Meadows alleged that it entered into the utility service contract with Inter-Continental in reliance on Inter-Continental's promise to develop Creekside as a residential subdivision, and that Derby Meadows would receive the connection charge for sewer and water service from Inter-Continental and the monthly utility service fees from residents of Creekside. Derby Meadows further alleged

that throughout 1980-1987 Inter-Continental's officers and agents made representations to the officers and agents of Derby Meadows as well as public and governmental bodies that Inter-Continental would develop the Creekside property as a residential subdivision, and that it would use Derby Meadows as its source of water and sanitary sewer utility service. Derby Meadows then listed the specific situations in which these representations were made including sessions before the Village plan commission and the Cook County zoning board. Derby Meadows also alleged specific facts to support its allegation that it had changed its position in reliance on Inter-Continental's representations by committing large sums of money to construct utility lines and a trunk line to service the Creekside property.

Inter-Continental first argues that Derby Meadows' promissory estoppel claim was legally insufficient because Derby Meadows alleged in its pleadings that it relied on representations made by Inter-Continental in 1987 although the construction performed in reliance on these representations occurred in 1985. Inter-Continental's argument is only partially accurate. Although Derby Meadows refers to representations made in 1987, Derby Meadows also states that: "Such representations were made by Inter-Continental in 1980 during negotiations between Inter-Continental's president and Perino ***."

Inter-Continental next argues that there was no basis for Derby Meadows' promissory estoppel claim because any representations by Inter-Continental were promises of future action. Inter-Continental cites *Ozier v. Haines* (1951), 343 Ill. App. 400, 99 N.E.2d 395, *aff'd* (1952), 411 Ill. 160, 103 N.E.2d 485, in support of its proposition that statements as to future action are not representations of existing fact and, therefore, do not give rise to estoppel. However, the court in *Ozier v. Haines* addressed the doctrine of equitable estoppel rather than the doctrine of promissory estoppel. The elements of equitable estoppel are: (1) words or conduct by the party against whom the estoppel is alleged consisting of misrepresentations or concealment of material facts; (2) the party against whom the estoppel is alleged must have actual or implied knowledge at the time the representations are made that they are untrue; (3) the truth regarding the representations is unknown to the party claiming the benefit of estoppel both at the time they are made and when they are acted on by him; (4) the party estopped must intend or expect that his conduct or representations will be acted on by the party claiming estoppel; (5) the party claiming estoppel does rely and act on the representations and in such a manner that he would be prejudiced if the party making the representations is allowed to deny the truth thereof. (*Lowenberg v.*

*Booth* (1928), 330 Ill. 548, 555-56, 162 N.E. 191.) The elements of promissory estoppel are: "(1) a promise, (2) which the promisor should reasonably expect to induce action or forebearance of a definite and substantial character on the part of the promisee, (3) which induces such action or forebearance, and (4) which must be enforced in order to avoid injustice." *Phillips v. Britton* (1987), 162 Ill. App. 3d 774, 785, 516 N.E.2d 692.

Although both forms of estoppel consist of words or conduct by one party which is expected or intended to cause action or forebearance on the part of another party, equitable estoppel is based on an intended misrepresentation or concealment of a material fact, while promissory estoppel is based on a promise, which is a "declaration that one will do or refrain from doing something specified." (Webster's Third International Dictionary 1851 (1986).) Furthermore, promissory estoppel claims based on future action have been recognized by Illinois courts. (See *Kaluzny Brothers, Inc. v. Mahoney Grease Service, Inc.* (1988), 165 Ill. App. 3d 390, 518 N.E.2d 1269; *Lawrence v. Board of Education of School District 189* (1987), 152 Ill. App. 3d 187, 503 N.E.2d 1201.) Thus, we conclude that Inter-Continental's statement of future action could give rise to a claim based on promissory estoppel.

Inter-Continental's remaining argument is that it was not reasonable for Derby Meadows to rely on Inter-Continental's statements regarding the development of Creekside because the statements were ambiguous and contingent on such future events as governmental approval and financing. However, in *Phillips* (162 Ill. App. 3d 774) and *Huegel v. Sassaman* (1979), 75 Ill. App. 3d 414, 393 N.E.2d 1361, cited by Inter-Continental in support of this argument, the ambiguity of the promise or the fact that it was based on some contingency was a factual determination by the trial judge following consideration of the evidence. In this case, Derby Meadows' promissory estoppel claim was rejected solely on the basis of the pleadings which, taken as true, were sufficient to state a cause of action for promissory estoppel. Therefore, it was error for the trial court to dismiss count II of Derby Meadows' second amended complaint.

Count III of the second amended complaint was a breach of contract claim against Orchard Hill, alleging that as a contract purchaser of Creekside lots, Orchard Hill was bound by the obligations of the contract between Derby Meadows and Inter-Continental. Derby Meadows supported its contract claim against Orchard Hill with allegations regarding the sale of Creekside to Orchard Hill and the actions Derby Meadows took to give Orchard Hill notice of the Inter-Continental

contract when Derby Meadows learned that Creekside might be sold. Based on the notice to Orchard Hill, Derby Meadows alleged that the utility service contract was a covenant running with the land and would be binding on subsequent purchasers such as Orchard Hill.

In order for a covenant to run with the land, the contracting parties must have intended it at the time of the contracting, the covenant must touch and concern the land and there must be privity of estate between the party claiming the benefit of the covenant and the party resting under its burden (*Streams Sports Club, Ltd. v. Richmond* (1983), 99 Ill. 2d 182, 188, 457 N.E.2d 1226; *Nassau Terrace Condominium Association, Inc. v. Silverstein* (1989), 182 Ill. App. 3d 221, 224, 537 N.E.2d 998; *Kessler v. Palmeri* (1972), 3 Ill. App. 3d 901, 904, 278 N.E. 813.) Therefore, the first determination to be made is whether Derby Meadows and Inter-Continental intended the utility service contract to be a covenant running with the land. Where the terms of the contract are plain and unambiguous, the intent of the parties must be determined solely from the words within the instrument. *Country Service & Supply Co. v. Harris Trust & Savings Bank* (1981), 103 Ill. App. 3d 161, 165, 430 N.E.2d 631; *Herbert Shaffer Associates, Inc. v. First Bank* (1975), 30 Ill. App. 3d 647, 653, 332 N.E.2d 703.

The utility service contract between Inter-Continental and Derby Meadows was clear and unambiguous, and it contained no language which illustrated that the parties intended to create an agreement which would run with the land. Therefore, Orchard Hill, as a contract purchaser of Creekside, was not bound by the utility service agreement between Derby Meadows and Inter-Continental, and the trial court's dismissal of Derby Meadows' claim against Orchard Hill was proper.

IV

Derby Meadows' final contention is that Judge Reynolds erred in granting summary judgment in favor of the Village on the tortious interference claim regarding the Inter-Continental contract. Because Derby Meadows stated a valid cause of action for breach of contract against Inter-Continental, the dismissal of count I of the second amended complaint was error. Therefore, it was also error to grant summary judgment in the Village's favor on Derby Meadows' tortious interference claim regarding the Inter-Continental contract.

Accordingly, the orders of the circuit court for summary judgment in Camelot Homes' favor, for dismissal of the tortious interference claim on the Camelot Homes' contract and for dismissal of the breach

of contract claim against Orchard Hill are affirmed. The orders dismissing the breach of contract and promissory estoppel claims against Inter-Continental and the order for summary judgment in the Village's favor on the tortious interference claim regarding the Inter-Continental contract are reversed.

Affirmed in part; reversed in part and remanded for further proceedings.

LaPORTA, P.J., and McNAMARA, J., concur.