# Illinois Official Reports

## Appellate Court

---

*Vassell v. Presence Saint Francis Hospital*, 2018 IL App (1st) 163102

---

| | |
|---|---|
| Appellate Court Caption | DIONNE VASSELL, Plaintiff-Appellant, v. PRESENCE SAINT FRANCIS HOSPITAL, Defendant-Appellee. |
| District & No. | First District, Third Division<br>Docket No. 1-16-3102 |
| Filed<br>Rehearing denied | May 30, 2018<br>June 27, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-L-7592; the Hon. John P. Callahan Jr., Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James A. Karamanis, of Barney & Karamanis, LLP, and Melanie Grabavoy Conviser, of Melanie Grabavoy Conviser & Associates, both of Chicago, for appellant.<br><br>Anthony J. Longo, Kenneth C. Hoffmann, and James A. Kearney, of Brennan Burtker, LLC, of Chicago, for appellee. |
| Panel | JUSTICE LAVIN delivered the judgment of the court, with opinion.<br>Presiding Justice Cobbs and Justice Fitzgerald Smith concurred in the judgment and opinion. |

**OPINION**

¶ 1    Plaintiff Dionne Vassell gave birth to a stillborn daughter and named her Zealia. She then signed a form authorizing defendant Presence Saint Francis Hospital to dispose of Zealia's remains. According to plaintiff, defendant's employees also orally told her that defendant would bury Zealia in a short period of time. Approximately one year later, Zealia's remains were still in the cooler of defendant's morgue, in a container with numerous other fetal remains.[1]

¶ 2    Shortly after learning that defendant had not buried Zealia's remains, plaintiff filed this action against defendant, who ultimately obtained summary judgment on plaintiff's negligence claim. Specifically, defendant asserted that plaintiff could not establish duty, breach, or damages. Plaintiff now appeals. Based only on the arguments properly raised in the trial court and preserved on appeal, we affirm the Cook County circuit court's judgment.

## I. THE BRIEFS

¶ 3

¶ 4    As a threshold matter, defendant urges us to strike plaintiff's brief for failing to comply with our supreme court's rules. Ill. S. Ct. R. 341 (eff. Nov. 1, 2017); R. 342 (eff. July 1, 2017). Specifically, defendant argues that (1) plaintiff's points and authorities section lacks references to the relevant pages of her brief, (2) her standard of review section is incomplete, (3) her jurisdictional statement is inaccurate, and (4) her fact statement contains argument and omits necessary citations to the record. We are inclined to agree, but defendant's brief suffers from its own deficiencies, including a selective fact section, improper legal citations, and arguments that are less than cohesive in certain regards. While this court may strike a brief as a sanction, we decline to strike either brief in this instance. See *Rottman v. Illinois State Officers Electoral Board*, 2018 IL App (1st) 180234, ¶ 23. These violations interfere with, but do not preclude, our review. *Id.* We urge counsel to review our supreme court's rules and take greater care in the future.

## II. BACKGROUND

### A. Initial Burial Arrangements

¶ 5

¶ 6

¶ 7    At a medical appointment on August 8, 2011, no heartbeat was detected in plaintiff's unborn child, who was over 20 weeks in gestational age. Labor was induced, and plaintiff delivered a stillborn girl the next day. According to plaintiff's mother, Denise Panton, the family was devastated. Plaintiff had obtained treatment at that hospital because Denise and plaintiff's father, Joseph Panton, both worked there.

¶ 8    Plaintiff asked for an autopsy to be performed and met with a female chaplain and two doctors, although she could not remember their names. The chaplain said the hospital could do the burial for her or she could arrange for the burial. Plaintiff testified in her deposition that upon inquiry of Oneil Young, Zealia's father, either a doctor or the chaplain said the burial would happen within a week or two.

---

[1]While Justice Fitzgerald Smith was unable to attend oral arguments in this matter, he has listened to the recording of those arguments and fully participated in this decision.

¶ 9    Denise related a somewhat different conversation. She testified in her deposition that outside of Young's presence, a tall, unidentified, older blonde woman said the hospital would contact plaintiff to inform her where Zealia was buried. The woman also said the burial would take place "as soon as paperwork is signed and everything is done ***. *** They don't keep [the] body long in the hospital."

¶ 10    In contrast, Maureen O'Brien, plaintiff's nurse, testified she would tell patients they could choose private burial or hospital burial. She also told patients that the latter option involved a mass burial at All Saints Cemetery and she had no information on when the burial would occur. O'Brien also testified that a number of people could potentially speak with a mother about fetal disposition. O'Brien had no specific recollection of plaintiff or Zealia.

¶ 11    In any event, plaintiff testified that she told Young she was "not in my right mind to do any burial right now." Consequently, the couple agreed that defendant would handle the burial. To that end, plaintiff signed a "Fetal Death Disposition-Notification Form" (the consent form).

¶ 12    Although Zealia was over 20 weeks in gestation, the consent form stated that it "shall be used to notify a mother of her disposition rights and options after experiencing a spontaneous fetal demise of less than 20 completed weeks of gestation." The Hospital Licensing Act had required the Illinois Department of Public Health Division of Vital Records to create this form with respect to fetuses less than 20 weeks in gestational age and required hospitals to provide that form to mothers. See 210 ILCS 85/11.4 (West 2010).

¶ 13    As executed by plaintiff, the consent form stated as follows:
> "I, Dionne Vassell, understand that within 24 hours of reading this notification, I have the right to arrange for the burial or cremation of these remains, or choose to let the hospital handle the disposition under the terms and conditions that the hospital may prescribe."

Plaintiff chose the latter option.

¶ 14    The consent form added, "I elect to have the hospital handle the disposition of these remains under the terms and conditions that it may prescribe. The hospital can explain the costs for this service, if any." The form was singularly lacking any informative terms, conditions, or circumstances relative to the disposition. Most notably given the facts of this unfortunate tale, it said nothing about the length of time it might take to bury the remains and did not mention the possibility that the remains might be commingled with other fetal remains. Additionally, plaintiff testified that no one from the hospital described any of defendant's terms and conditions, aside from the timing of the burial. She signed the document without reading it because "we" had already discussed it. She claimed that her emotional distress and medication also prevented her from reading it.

¶ 15                                    B. After Discharge

¶ 16    According to plaintiff, she called defendant every day following discharge for the autopsy results. She spoke to a woman in the laboratory about 20 times and obtained the autopsy report in person a month or two after Zealia's delivery but did not inquire about the burial at that time.

¶ 17    Almost a year after Zealia's delivery, plaintiff and Young decided she was strong enough to visit Zealia. Plaintiff also wanted to obtain the death certificate so she and Young could have closure. Plaintiff testified that at the office of vital records in Evanston, the receptionist told

plaintiff and Young to return to the hospital because Zealia was not in the system.[2] Plaintiff, accompanied by some family members, returned to the hospital, but the several accounts of what followed are not entirely consistent.

¶ 18                                    C. Three Accounts

¶ 19      Plaintiff testified that she went to the laboratory to see the older African American woman who was previously involved with the autopsy report. Plaintiff relayed her attempt to get the death certificate and asked if Zealia had been buried. According to plaintiff, the woman said, "Oh, I'm so sorry. I'm so sorry." She then said she needed to call her supervisor. Joseph said, however, that he was going down to the morgue to see if Zealia was really there. Plaintiff testified, "once they tell me my baby wasn't buried, I wanted to go see for myself." She was crying and upset. In addition, Denise and the woman from the laboratory accompanied them, although the woman said, "I'm not supposed to do this."

¶ 20      When Joseph opened the morgue cooler, they all went inside, where they saw several containers. One container was labeled with a list bearing 10 to 14 names, including Zealia's name. When plaintiff asked the woman how she knew Zealia was inside the container in light of the list, the woman again apologized and noted that she was not supposed to be there. She also said they could not open the container due to the chemicals inside. Plaintiff became very angry and wanted to speak to the supervisor, who finally arrived when they returned upstairs.

¶ 21      The supervisor, described as an older Hispanic woman, suggested that Zealia had only been there for a month and that the hospital had been "backed up." Plaintiff responded that it had not been a mere month and sent the supervisor to check her records. The supervisor never returned, however. Plaintiff testified that she was angry, was crying, and had to be escorted from the building.

¶ 22      According to Denise, she and plaintiff spoke to Vivian Sarashinsky, the administrative director of the laboratory. Although Denise described Sarashinsky as having dreadlocks, it appears that she did not.[3] Indeed, Cheryl Kendrick would testify in her deposition that she had dreadlocks and was the employee involved in this encounter. In any event, Denise testified that after she told Sarashinsky that defendant was being neglectful, Sarashinsky panicked and went to get her supervisor, a woman whose name Denise could not recall. That supervisor said that defendant would not store fetal remains for a year and that the matter was out of her hands. She then left.

¶ 23      At Denise's request, Sarashinsky took her and plaintiff to the morgue. Joseph was not present for the conversation with Sarashinsky or her supervisor and did not go to the morgue. The three women went inside the freezer, where they saw a cardboard box that listed 10 names, including Zealia's. Denise opened the box and removed the jar holding Zealia's remains. No one escorted them out of the hospital.

¶ 24      Kendrick testified that she took plaintiff and her parents to the morgue because they wanted to know where their baby was. No one opened the container, however. Sarashinsky subsequently told Kendrick that Richard Lavacchi, the vice president of professional and

_____

[2]Denise testified, however, that she, rather than Young, accompanied plaintiff to obtain the death certificate.

[3]Denise testified that after this incident, she next saw Sarashinsky when Denise herself began working in the laboratory.

- 4 -

support services, felt that Kendrick should not have taken the family to the morgue.

¶ 25                                   D. Subsequent Burial Arrangements

¶ 26     Denise testified that she and plaintiff, without Young, met an administrator named "Angelica" and her boss, Christian Yager, in a conference room. They were shocked to learn that Zealia's remains were still in the morgue, and Angelica wanted to find out what defendant's policy was. Denise responded, "I don't know the policy, but I know *** no hospital going to give you a policy one year having a fetus in a cooler."

¶ 27     Plaintiff testified to a different meeting she attended with Denise and Young in the administrative office. At that meeting, plaintiff explained to a woman from the hospital that Zealia was still in the morgue after a year and that defendant was going to bury her in a mass grave. The woman disputed this, and plaintiff demanded to speak to her supervisor. The woman returned with a middle-aged man with fair complexion and black hair and Chaplain Michael Doyle, who was relatively new to the hospital. When plaintiff asked how long the hospital waited to bury someone who died there, the supervisor said that it should be a couple of weeks. Plaintiff responded that he was lying, as her baby was still in the basement. The supervisor did not believe her.

¶ 28     In contrast, Doyle testified in his deposition that he walked plaintiff and Young to the meeting room where they met with Lavacchi; Angelique Richard, the chief nursing officer; and Maureen Hanlon, the risk manager. Doyle offered a short prayer, and then Lavacchi took over the meeting. Doyle had been told that the remains were left in the container for an inappropriately long time, but he did not recall who told him that. At some point, the couple wanted a break. Lavacchi's testimony somewhat corroborated Doyle's account, but Lavacchi was seemingly unable to recall any details. Plaintiff subsequently signed a new consent form that superseded the one signed a year earlier.

¶ 29     In the new consent form, plaintiff chose to make her own burial arrangements. Before the burial, however, she had Dr. James Bryant do an autopsy to be sure she was not burying someone else's baby. According to the statement of Dr. Bryant, he examined the remains, but the use of formaldehyde prevented accurate DNA testing. Zealia's internal organs were missing, and only her face was intact. He nonetheless concluded by examining photos taken after delivery that the remains belonged to Zealia. The funeral director subsequently wrote to the department of vital records to explain why the fetal death certificate was being filed so late.

¶ 30                                        E. Burial Procedure

¶ 31     Sarashinsky testified at length regarding defendant's procedure for handling fetuses. "Once we had the—a number of fetuses waiting for burial, we would gather them altogether, place them in a Rubbermaid container, [and] attach a paper listing of all the fetuses that were in the container." Inside the container, the fetal remains were wrapped in surgical cloth. While some were sent to the laboratory in formalin, they were removed from formalin before being put in the container. The container of fetal remains was then placed in the morgue cooler. Finally, Sarashinsky would contact Edwin Cruz, the funeral director who voluntarily picks up the fetuses, and would give the relevant paperwork to admitting. The paperwork needed to include death certificates for fetuses over 20 or 22 weeks of gestational age.

¶ 32        Sarashinsky testified that there was not a specific number of remains required before she could contact Cruz and it was her judgment call. While the amount of time that remains had been ready for burial was not a factor, their collective size and the number that would fit in the container were factors. She noted dryly that she tried "to fill out the container," while claiming that the cemetery specified the size of the container and requested that each be full.

¶ 33        Contrarily, Cruz testified that the size of containers he picked up varied and that defendant did not need a certain number of remains before they called him. In fact, he had picked up containers with the remains of a single fetus. Cruz added that he would sometimes call defendant to see if it had any remains that needed to be picked up.

¶ 34        According to Sarashinsky, Cruz had been expected to pick up the container holding Zealia's remains in June, which we note was approximately 10 months after Zealia's delivery. Sarashinsky had found the container before plaintiff came to find Zealia. Cruz subsequently told Sarashinsky that, when he came to collect the remains, the employee on duty did not know where the paperwork was so he left empty-handed. Sarashinsky testified that, coincidentally enough, Cruz was scheduled to come back the very evening that plaintiff came to the hospital or the day after. Cruz denied recalling any incident in which the hospital could not find the paperwork.

¶ 35        Lavacchi testified in his deposition that defendant had complied with its burial policy, which did not include a time frame for burial. He acknowledged that the policy probably anticipated a reasonable time for burial, but he had no opinion about what would be reasonable.

¶ 36        Hanlon testified that defendant used the consent form, form RHC-219, for every neonatal fetal demise, even for fetuses over 20 weeks old. She acknowledged, however, that defendant's written policy governing the "demise of fetuses of more than 20 weeks gestation" referred to "RHC-219C," not RHC-219.[4] She did not remember whether that was a separate form. After this incident, defendant considered altering the form to specify that the baby would be buried in a common burial ground.

¶ 37                                        F. The Pleadings

¶ 38        Plaintiff commenced this action against defendant and, after some contentious motion practice, ultimately filed a third-amended complaint, alleging causes of action for negligence, negligent counseling, fraud, interference with possession of remains, negligent infliction of emotional distress, and intentional infliction of emotional distress. The pleading also included an institutional negligence claim while stating that the claim had been previously stricken.

¶ 39        The negligence count alleged that defendant voluntarily undertook Zealia's burial, thereby creating a duty to provide a timely burial as promised. Plaintiff alleged that defendant breached that duty by, among other things, (1) failing to make timely arrangements for burial, (2) placing the remains in a container with multiple other remains, (3) failing to report Zealia's death to the local registrar (410 ILCS 535/20 (West 2010)),[5] (4) using an inapplicable consent form, (5) failing to have or follow adequate burial policies, and (6) failing to monitor its

_____

[4]The parties have not addressed whether the Illinois Department of Public Health Division of Vital Records has created a form for fetuses over 20 weeks in gestational age.

[5]See 410 ILCS 535/20(1) (West 2010) (stating that each fetal death following a gestation period of 20 weeks "shall be registered with the local or subregistrar of the district in which the delivery occurred within 7 days after the delivery").

employees. As a direct and proximate result of defendant's conduct, plaintiff sustained severe, physical injuries and emotional distress knowing her infant's remains were not provided a proper burial. We note that plaintiff testified she had sustained no physical injuries but had endured emotional distress and depression, which she addressed solely by talking with Denise. She also sought burial and autopsy expenses.

¶ 40 On December 18, 2014, the trial court dismissed all claims other than that for negligence. Defendant subsequently filed an answer, which stated that "plaintiff wished the hospital to arrange for burial of the stillborn fetus pursuant to a signed written agreement," while averring that defendant made no representations as to timing. Defendant also raised affirmative defenses based on the economic loss doctrine, failure to mitigate, waiver by contract, abandonment, assumption of the risk and consent. Defendant essentially asserted that the consent form constituted a contract defining any duty and did not specify that Zealia was to be buried within a year. In reply, plaintiff effectively denied that what she signed was an agreement, as opposed to an authorization.

¶ 41 Defendant moved for summary judgment, asserting that (1) defendant owed plaintiff no duty, (2) the voluntary undertaking doctrine did not apply, (3) defendant did not breach that duty because it had been in the process of complying, and (4) the economic loss doctrine precluded the recovery of any damages. In response, plaintiff argued that defendant undertook a duty of care to bury Zealia and whether defendant breached that duty was a question for the jury. Plaintiff also argued that the economic loss doctrine did not apply because the consent form was not a contract. In reply, defendant argued, among other things, that plaintiff could not consider certain hearsay in assessing defendant's motion.

¶ 42 Meanwhile, plaintiff moved to reinstate her institutional negligence claim in light of her recently disclosed expert, Dr. Arthur Klein, who was of the opinion that there were substantial deviations from accepted hospital performance with respect to the disposition of Zealia's remains. Defendant moved to strike plaintiff's recent disclosure, as it was made only 33 days before trial, while also objecting to reinstating the institutional negligence claim, which was based on the untimely disclosed opinion.

¶ 43 At a hearing on October 27, 2016, the trial court entered summary judgment in favor of defendant, essentially finding that defendant's duty was defined by the terms of the consent form, which constituted a contract, the contents of which did not set forth any duty to bury the remains within a year. The court also found that, even if plaintiff could show defendant voluntarily undertook a duty to dispose of Zealia's remains, defendant was in the process of carrying out that duty. The court also held that because the consent form was a contract, the economic loss doctrine prevented plaintiff from recovering damages for her emotional distress. Finally, the court struck the untimely disclosure of Dr. Klein's opinion and denied plaintiff's motion to reinstate her institutional negligence claim. This appeal followed.

¶ 44                                            III. ANALYSIS

¶ 45 On appeal, plaintiff first challenges the trial court's determination that defendant was entitled to summary judgment on her negligence claim.

¶ 46 Summary judgment is appropriate where the pleadings, admissions on file, affidavits, and depositions show there are no genuine issues of material fact so that the movant is entitled to judgment as a matter of law. *Bruns v. City of Centralia*, 2014 IL 116998, ¶ 12. In making that determination, courts must view such items in the light most favorable to the nonmovant.

*Guterman Partners Energy, LLC v. Bridgeview Bank Group*, 2018 IL App (1st) 172196, ¶ 48. We review the trial court's summary judgment ruling *de novo*. *In re Application of Will County Collector*, 2018 IL App (3d) 160659, ¶ 12.

¶ 47 A plaintiff asserting negligence must plead and ultimately prove that the defendant owed a duty, the defendant breached that duty, and the breach proximately caused the plaintiff's injury. *Bogenberger v. Pi Kappa Alpha Corp.*, 2018 IL 120951, ¶ 21. The primary element at issue here is duty. Courts must determine whether duty exists as a question of law. *Id.*

¶ 48 Plaintiff asserts that defendant voluntarily undertook a duty to bury Zealia and that, having done so, defendant had to carry out that duty in a reasonable manner. In contrast, defendant asserts that the consent form constitutes a contract that controls the extent of any duty toward plaintiff. Plaintiff essentially argues in reply that the form was not a contract and the existence of a contract in and of itself does not necessarily foreclose a voluntary undertaking.

¶ 49                                    A. The Consent Form

¶ 50 Defendant first contends that both plaintiff and her attorney agreed in the trial court that the consent form was a contract. We find this statement at once incomplete and disingenuous. While it is true that plaintiff testified she had "an agreement" with defendant, plaintiff is a lay person, not an attorney. The record does not show plaintiff was using that term in anything but the colloquial sense. In addition, plaintiff's attorney specifically asserted in the trial court that the consent form was not a contract. To be sure, plaintiff's counsel was frequently loose with legal language. In context, however, counsel did not utter an unequivocal statement that could properly be construed as a judicial admission. *Smith v. Pavlovich*, 394 Ill. App. 3d 458, 468 (2009) (stating that judicial admissions are clear, deliberate, unequivocal statements and courts must consider alleged admissions in context); *Derby Meadows Utility Co. v. Inter-Continental Real Estate*, 202 Ill. App. 3d 345, 355-56 (1990) (finding a deposition witness's testimony that "they had a deal" was not an unequivocal statement that a contract existed and, thus, was not a judicial admission).[6]

¶ 51 The formation of a contract requires an offer, acceptance, and consideration. *Hedlund & Hanley, LLC v. Board of Trustees of Community College District No. 508*, 376 Ill. App. 3d 200, 205-06 (2007).[7] More specifically, contracts require *mutual* consideration. *Canel & Hale, Ltd. v. Tobin*, 304 Ill. App. 3d 906, 914 (1999). Moreover, a legally binding contract requires terms that are reasonably definite and certain. *Midwest Builder Distributing, Inc. v. Lord & Essex, Inc.*, 383 Ill. App. 3d 645, 658 (2007).

[6]We note that defendant has not alleged that providing burial was part of some greater contract to provide plaintiff with services.

[7]While plaintiff's opening brief argued that the existence of a contract presents a factual question, plaintiff argues in her reply brief that we determine *de novo* whether a contract was formed. Compare *Pepper Construction Co. v. Palmolive Tower Condominiums, LLC*, 2016 IL App (1st) 142754, ¶ 81 (stating that whether a contract exists and, if so, what its terms are constitute factual questions for the trier of fact), with *Performance Food Group Co. v. ARBA Care Center of Bloomington, LLC*, 2017 IL App (3d) 160348, ¶¶ 1, 7, 20 (affirming the trial court's summary judgment order and finding a contract existed where the defendants' answer admitted it), and *Mid-Century Insurance Co. v. Founders Insurance Co.*, 404 Ill. App. 3d 961, 967 (2010) (stating that where the facts are undisputed, whether a contract exists constitutes a question of law that the trial court may decide on a summary judgment motion).

¶ 52    This consent form was decidedly *not* a contract, and any consent that plaintiff gave was decidedly uninformed or misinformed, as the hospital employees never gave her any indication that the fetal remains would be pooled in a container for many months along with other fetal remains. Furthermore, neither the form, the witnesses' testimony, nor the parties' arguments have identified any consideration that plaintiff was to give the hospital for disposing of Zealia's remains. While defendant reasonably argues that plaintiff received consideration in the form of relieving her of the burden of burying Zealia, unilateral consideration is insufficient. Defendant's counsel represented in the trial court that the service was free, and no one has suggested that defendant received any benefit from possessing Zealia's remains. Moreover, the consent form clearly did not result from a bargain between the parties. Instead, a governmental entity created that form as mandated by statute. *Cf. Rojas Concrete, Inc. v. Flood Testing Laboratories, Inc.*, 406 Ill. App. 3d 477, 480 (2010) (stating that allegations of negligence based upon a contractual duty are defined by the contract, despite sounding in tort).

¶ 53    In light of our determination that the consent form was not a contract, we need not consider plaintiff's contention that any contract would be void. Similarly, our finding defeats defendant's reliance on the economic loss doctrine. There was no bargain here. See *Anderson Electric, Inc. v. Ledbetter Erection Corp.*, 115 Ill. 2d 146, 153 (1986) (stating that "[a] plaintiff seeking to recover purely economic losses due to defeated expectations of a commercial bargain cannot recover in tort, regardless of the plaintiff's inability to recover under an action in contract"). Furthermore, we need not consider whether an exception to that doctrine would apply. See *Trans States Airlines v. Pratt & Whitney Canada, Inc.*, 177 Ill. 2d 21, 26-27 (1997) (setting forth exceptions to the economic loss doctrine, including an exception where the plaintiff has sustained personal injury or property damage due to a sudden or dangerous occurrence). We now address whether plaintiff can demonstrate duty based on the voluntary undertaking doctrine.

¶ 54                                B. Voluntary Undertaking

¶ 55    Our supreme court has adopted the relevant sections of the Restatement (Second) of Torts. *Bell v. Hutsell*, 2011 IL 110724, ¶ 12. Section 323, titled "Negligent Performance of Undertaking to Render Services," states as follows:

> "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> > (a) his failure to exercise such care increases the risk of such harm, or
> >
> > (b) the harm is suffered because of the other's reliance upon the undertaking."
>
> Restatement (Second) of Torts § 323 (1965).

See also Restatement (Second) of Torts § 324A (1965) (imposing liability for "physical harm" to a third person). Pursuant to this theory, which is narrowly construed, the defendant's duty of care is limited to the extent of his undertaking. *Bell*, 2011 IL 110724, ¶ 12. Thus, courts will reject overly broad interpretations of an undertaking. *Frye v. Medicare-Glaser Corp.*, 153 Ill. 2d 26, 33 (1992).

¶ 56    Here, it is undisputed that defendant agreed to bury Zealia's remains. While defendant contends it did not undertake a duty to bury her within one year, the passage of a year is more

relevant to breach in this instance, as opposed to duty. See *Bell*, 2011 IL 110724, ¶ 23 (stating that a defendant, upon undertaking to act, is subject to a duty as to the manner of his performance); *Cross v. Wells Fargo Alarm Services*, 82 Ill. 2d 313, 317 (1980) (finding "[a] duty voluntarily assumed must be performed with due care or 'such competence and skill as [one] possesses' " (quoting *Nelson v. Union Wire Rope Corp.*, 31 Ill. 2d 69, 85-86 (1964))). Even assuming no representative of the hospital ever gave plaintiff a time frame for burial, a jury could surely find that keeping Zealia's remains in its morgue, commingled with other remains in a container for a year, was manifestly unreasonable and unconscionable, amounting to a breach of defendant's duty to exercise due care. Moreover, a trier of fact could find that, contrary to Sarashinsky's testimony, defendant's burial process had been halted indefinitely, due to an administrative snafu.

¶ 57 Nonetheless, plaintiff cannot establish duty based on a voluntary undertaking as set forth in the Restatement. First, it is not entirely clear whether defendant could have declined to dispose of Zealia's remains, *i.e.*, whether the undertaking was truly voluntary. As stated, defendant used a government-issued form. Additionally, the record shows that, as a Catholic hospital, defendant buries all human remains. Furthermore, the record does not show that defendant acted to protect plaintiff or her property, rather than to satisfy what it believed to be a legal requirement. See *Cochran v. Securitas Security Services USA, Inc.*, 2017 IL 121200, ¶ 12 (stating that although a dead body is not subject to property right in the ordinary sense, the next of kin have the right to possess remains to carry out an appropriate disposition); *Drakeford v. University of Chicago Hospitals*, 2013 IL App (1st) 111366, ¶ 14 (stating that the next of kin have a quasi-property right to possess remains and dispose of them), *abrogated on other grounds by Cochran*, 2017 IL 121200.

¶ 58 More importantly, plaintiff testified that she sustained no physical injury. As stated, the voluntary undertaking doctrine results in liability for physical harm. Stated differently, a duty based on a voluntary undertaking is available only to claimants asserting physical harm. In addition, physical harm does not include emotional or fiscal harm. Compare *Frye*, 153 Ill. 2d at 32 (stating that the voluntary undertaking theory renders one liable for "bodily harm"), *Rojas Concrete, Inc.*, 406 Ill. App. 3d at 483-84 (finding that the plaintiff did not sufficiently plead a duty under the voluntary undertaking doctrine because it did not allege that any bodily harm occurred), and *Brogan v. Mitchell International, Inc.*, 181 Ill. 2d 178, 185 (1998) (finding the reviewing court erroneously equated emotional harm with physical harm to establish a duty to relay accurate information), with *Pavlik v. Kornhaber*, 326 Ill. App. 3d 731, 744 (2001) (stating that emotional distress is a type of personal injury). Consequently, plaintiff has not established the element of duty. *Cf. Nelson*, 31 Ill. 2d at 71, 73, 80, 83-84 (where several workers were killed and injured in a construction accident, the supreme court found under Florida law that the insurer's gratuitous undertaking to provide inspections to benefit the employees' safety resulted in an enforceable duty that was not affected by any contractual duty).

¶ 59 In light of our determination that plaintiff has not established defendant owed a duty, we need not consider the parties' remaining arguments regarding the other elements of negligence. The trial court properly entered summary judgment in defendant's favor.

¶ 60 Lest this result be viewed as harsh and uncharitable, we note that another cause of action was available to plaintiffs suffering from nonphysical harm due to the treatment of a corpse. It is well settled that Illinois recognizes a cause of action for tortious interference with the right to

- 10 -

possess a corpse. *Cochran*, 2017 IL 121200, ¶ 12. This cause of action has existed in this state for more than a century. See *Mensinger v. O'Hara*, 189 Ill. App. 48, 55 (1914) (stating that "the custodian of [a corpse] has a legal right to its possession for the purposes of preservation and burial, and that any interference with that right, by mutilating or otherwise disturbing the body, is an actionable wrong" (internal quotation marks omitted)). To be clear, it does not contemplate a literal right of family members to possess the corpse of their loved ones. Instead, it reflects a duty not to interfere with the next of kin's right to dispose of remains. See *Cochran*, 2017 IL 121200, ¶ 26.

¶ 61 Under section 868 of the Restatement (Second) of Torts, "[o]ne who intentionally, recklessly or *negligently* removes, *withholds*, mutilates or operates upon the body of a dead person or *prevents its proper interment* or cremation *is subject to liability to a member of the family of the deceased who is entitled to the disposition of the body*." (Emphases added.) Restatement (Second) of Torts § 868 (1979). Furthermore, a plaintiff is entitled to damages for the mental suffering proximately caused by such misconduct. *Cochran*, 2017 IL 121200, ¶ 12. This is because that mishandling a corpse creates "an especial likelihood of genuine and serious mental distress, arising from the special circumstances, which serves as a guarantee that the claim is not spurious." Prosser and Keeton on the Law of Torts § 54, at 362 (W. Page Keeton *et al.* eds., 5th ed. 1984); see also *Drakeford*, 2013 IL App (1st) 111366, ¶ 57 (stating that a plaintiff may recover for emotional distress despite no evidence that she sought medical treatment).

¶ 62 Here, the trial court dismissed plaintiff's claim for interference with possession of remains. Remarkably enough, plaintiff has *not* challenged that order on appeal. Plaintiff's counsel also conceded at oral arguments that this claim has been abandoned. That being said, the existence of another potential cause of action buttresses our determination that plaintiff's voluntary undertaking theory was misplaced here. Simply put, plaintiff abandoned the proper remedy, paving the way to the dismissal of this action.

¶ 63                    C. Denial of Leave to Reinstate Institutional Negligence

¶ 64 Finally, we reject plaintiff's assertion that the trial court abused its discretion in denying her leave to reinstate the institutional negligence count.

¶ 65 A trial court should generally exercise its discretion liberally toward permitting amendments, but the right to amend is not absolute. *Alpha School Bus Co. v. Wagner*, 391 Ill. App. 3d 722, 748 (2009). A trial court should consider (1) whether an amendment would cure defective pleadings, (2) whether an amendment would prejudice or surprise other parties, (3) the timeliness of the amendment proposed, and (4) whether the plaintiff had earlier opportunities to amend. *Id.* We will not reverse the trial court's decision absent an abuse of discretion. *CitiMortgage, Inc. v. Parille*, 2016 IL App (2d) 150286, ¶ 44. Furthermore, an abuse of discretion occurs only where the court exceeds the bounds of reason, adopts a position that no reasonable person would take, or acts arbitrarily, without using conscientious judgment. *Lake County Grading Co. v. Forever Construction, Inc.*, 2017 IL App (2d) 160359, ¶ 86.

¶ 66 Plaintiff argues that the trial court abused its discretion in denying leave to reinstate the institutional negligence count because her expert opined that defendant was guilty of institutional negligence. The trial court struck the disclosure of that expert, however. See Ill. S. Ct. R. 218(c) (eff. July 1, 2014) (requiring that discovery be completed 60 days before trial).

Additionally, whether the court properly struck plaintiff's expert presents a separate legal matter from whether the court erroneously denied leave to reinstate the institutional negligence count. Although plaintiff's fact section suggested that the court improperly struck her expert and her argument section hinted at such error, neither plaintiff's hint nor her oblique and misplaced suggestion salvage that argument. Ill. S. Ct. R. 341(h)(7) (eff. Nov. 1, 2017) (stating that points not argued are forfeited and shall not be raised in the appellant's reply brief). We further find that to the extent her reply brief states that we should review the order that originally dismissed the institutional negligence claim *de novo*, plaintiff has failed to develop an argument challenging that order in her opening brief. Accordingly, that too is forfeited. *Id.*

¶ 67      Here, plaintiff moved to reinstate a count a mere 33 days before trial, and the court subsequently struck the expert opinion on which the motion was based. That decision was clearly within the trial court's discretion.

¶ 68                                  IV. CONCLUSION

¶ 69      Based on the arguments before us, we affirm the trial court's order granting defendant summary judgment on plaintiff's negligence claim. We also find the court did not abuse its discretion in denying plaintiff's motion to reinstate the institutional negligence count 33 days before trial.

¶ 70      For the foregoing reasons, we affirm the trial court's judgment.

¶ 71      Affirmed.